STATE, Respondent, vs. HOFFMAN, Appellant.

*April 14—June 21, 1938.*

236

For the appellant there was a brief by *Barber, Keefe, Patri & Stillman* of Oshkosh, and oral argument by *Frank B. Keefe.*

For the respondent there was a brief by *Lewis C. Magnusen,* district attorney of Winnebago county, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. Magnusen* and *Mr. Messerschmidt.*

NELSON, J.   The crime of which the defendant was convicted is one of the most serious known to the law.   This court, ever since *Conners v. State,* 47 Wis. 523, 2 N. W. 1143, has consistently adhered to a strict rule as to the proof required in such cases.   *Whittaker v. State,* 50 Wis. 518, 7 N. W. 431; *Bohlmann v. State,* 98 Wis. 617, 74 N. W. 343; *O'Boyle v. State,* 100 Wis. 296, 75 N. W. 989; *Devoy v. State,* 122 Wis. 148, 99 N. W. 455; *Brown v. State,* 127 Wis. 193, 106 N. W. 536; *McLain v. State,* 159 Wis. 204, 149 N. W. 771; *B—— v. State,* 166 Wis. 525, 166 N. W. 32; *Purpero v. State,* 190 Wis. 363, 208 N. W. 475; *Starr v. State,* 205 Wis. 310, 237 N. W. 96.

In *Conners v. State, supra,* it was said in discussing the charge of the trial court (p. 527) :

"It did not press upon their attention the principle or rule that voluntary submission by the woman, while she has power to resist, no matter how reluctantly yielded, removes from the act an essential element of the crime of rape.   The jury were not expressly told that if the carnal knowledge was with the voluntary consent of the woman, no matter how tardily given, or how much force had been theretofore employed, it is no rape."

In *Devoy v. State, supra,* it was said (p. 152) :

"The ingredient which gives the offense its atrocious character is the violation of the woman's person under circumstances while exerting the utmost power in protection of herself.   Utmost reluctance must be shown, and it must also

appear that she availed herself of every reasonable opportunity to make the utmost resistance in repelling the assailant and preventing him from accomplishing his purpose. Under the circumstances of such an attack, a passive demeanor on her part is not sufficient to show utmost resistance, if she was sufficiently possessed of her mental faculties to apprehend her danger and to control her physical powers in her defense."

In *Brown v. State, supra,* the law was thus stated (p. 199) :

"Not only must there be entire absence of mental consent or assent, but there must be the most vehement exercise of every physical means or faculty within the woman's power to resist the penetration of her person, and this must be shown to persist until the offense is consummated. We need not mention the exception where the power of resistance is overcome by unconsciousness, threats or exhaustion. . . . Further, it is settled in this state that no mere general statements of the prosecutrix, involving her conclusions, that she did her utmost and the like, will suffice to establish this essential fact, but she must relate the very acts done, in order that the jury and the court may judge whether any were omitted."

In *McLain v. State, supra,* the rule was thus reiterated (p. 206) :

"It is undoubtedly true, as claimed by the defendant, that in order to constitute the crime of rape there must not only be the entire absence of consent, but there must be the utmost resistance by the woman by all means within her power. . . .

"It must be remembered that the term 'utmost resistance' is a relative rather than a positive term. What would be 'utmost resistance' on the part of a weak and nervous person, with a temperament easily frightened, might be the veriest sham on the part of a robust person in good health, whose nerves and courage are normal."

The rule thus firmly established is of course subject to the exception that the power to resist may be overcome by

threats which reasonably induce in the mind of the woman an overmastering fear. In such cases, resistance to the utmost of her physical powers is not required. In *O'Boyle v. State, supra,* it was said (p. 299) :

"To authorize a conviction of rape, the jury must believe that the offense was accomplished by force, and against the will of the prosecutrix, and that there was the utmost reluctance and resistance on her part, or that her will was overcome by force *or fear* of the defendant."

In *Loescher v. State,* 142 Wis. 260, 263, 125 N. W. 459, it was said :

"In order to constitute the crime of rape the evidence must show that the act was committed by force and against the will of the female; but where the *female is rendered insensible through fright, or ceases resistance under fear of death or great bodily harm,* the consummated act is rape. . . .

" 'A consent from fear of personal violence is void; and though a man lays no hands on a woman, yet if by an array of physical force he so overpowers her that she dares not resist, his carnal intercourse with her is rape.' ' This court has often recognized the rule that where the will of the woman is overcome by threats of great personal injury there is no consent."

In *Bohlmann v. State, supra,* appears the following language (p. 620) :

"The power of resistance need not necessarily be overcome by superior physical force; if overcome by fraud *or fear of serious personal injury,* or if physical resistance becomes so useless as to warrant it ceasing upon that ground, there being no consent or submission in the sense of mental operation, the essential of the accomplishment of the act by force and against the will of the outraged party is fully satisfied. The law as thus laid down is too well understood and has been too frequently applied in this court to require discussion or call for any citation of authority."

In *Showalter v. State,* 148 Wis. 450, 455, 134 N. W. 830, the following instruction was approved:

" 'To constitute rape the connection must be against her will, and there must be the utmost reluctance and resistance on her part, or her will must be overcome *by fear and terror so extreme as to preclude resistance.'* "

In commenting upon the evidence in that case the court said (p. 454):

"It is manifest from her evidence that her physical powers had then been exhausted by reason of the prolonged struggle, to the point of incapacitating her to effectually resist his attack, and that she was then so terrified in mind as to be well nigh incapable of continuing her resistance to repel him."

It therefore clearly appears that "the fear" which renders the utmost resistance unnecessary is a "fear of death or great bodily harm," a "fear of great personal injury," or "serious personal injury," a fear that "so overpowers her that she dares not resist," a "fear and terror so extreme as to preclude resistance," a fear which renders her mind "well nigh incapable of continuing her resistance to repel him." The fear therefore must not only be real but so great as to terrify her and render her practically incapable of resistance. With this review of the law, we may now proceed to discuss the contentions of the defendant in connection with the proven facts.

The defendant contends that the court erred in refusing to discharge him for the reason that the verdict was contrary to the law and the evidence, and for the reason that the evidence adduced in support of the charge was insufficient to sustain a conviction of rape. The defendant further contends that the court erred in refusing to set aside the verdict and grant him a new trial because the verdict, if permitted to stand, will result in a miscarriage of justice.

On July 16, 1937, the complaining witness, a registered nurse of several years' experience, was nearly twenty-six

years of age, and employed at a local hospital in the city of Oshkosh. She weighed about ninety-eight pounds. The defendant was twenty-six years of age and weighed one hundred fifty pounds. At about 9 o'clock in the evening of July 15, 1937, the complaining witness and a girl friend, Charlotte Sontoski, were walking north on Main street in the city of Oshkosh, intending shortly to turn east onto Merritt street and walk to the nurses' home where the former resided. They met the defendant and one Bauer, both of whom were acquainted with Miss Sontoski but neither with the complaining witness. After a brief conversation, the young ladies proceeded on their way. The defendant and Bauer got into the defendant's automobile, which was parked nearby, and shortly thereafter encountered the two girls at the intersection of Jefferson and Merritt streets. The young men invited the two girls to get into the automobile and offered to take them wherever they wanted to go. As the defendant was driving toward the hospital some one proposed that they go for a ride as the evening was beautiful. All agreed to that. The defendant, however, had some business to attend to, and it was agreed that the two girls and Bauer would wait for him at the Tip Top Tavern on Main street while he transacted his business. The girls and Bauer were let out at the tavern mentioned and went inside to await the return of the defendant. Bauer ordered three glasses of beer, but as the complaining witness did not like beer she drank only a part of her glass. After about half an hour the defendant returned to the tavern, and shortly thereafter the four got into his automobile and drove about four miles north of the city of Oshkosh where the car was parked and its lights turned out. With little loss of time, both couples engaged in "petting" and "necking." The defendant put his arms around the complaining witness and kissed her a number of times without objection by her except a comment that she was not strong for that sort of thing. After

about half or three-quarters of an hour, the party started back toward the city of Oshkosh. Miss Sontoski lived where she was employed, about a mile south of the city. It was apparently agreed, or at least understood, that Miss Sontoski should first be taken home. She was driven to the place where she worked, and upon arriving there she and Bauer got out of the automobile. Bauer did not return for about half an hour. According to the complaining witness, nothing took place while she and the defendant sat in the automobile and waited the return of Bauer. She told the defendant that she was very tired and was anxious to get home and expressed the wish that Bauer would hurry up and return. The defendant testified that while they were waiting for the return of Bauer he had his arms around the complaining witness and that he kissed her several times. When Bauer finally returned the defendant drove him to his home. Bauer resided near the city limits on the Fourth street road which runs in a westerly direction out into the country. After Bauer was let out at his home, the defendant proceeded to drive westerly on that road about two miles to a secluded spot near the Algoma town hall. He turned his automobile to the north off the Fourth street road and drove several hundred feet on a town road. He stopped his automobile off the traveled portion of the road and turned off all of his lights except the radio light. The nearest house was approximately forty rods east of the town road. Up to this time the complaining witness had made no protest. She raised no objection to being driven out into the country away from the city of Oshkosh, to the parking of the car on the town road, or to the switching off of the lights. The complaining witness testified that shortly thereafter the defendant put his arms around her and drew her close to him; that he then tried to put his left hand under her dress; that she shouted that she was going to get out of the car and walk home; that she opened the door, pulled away from him

and got out of the car; that as she was attempting to get out of the car he grabbed her by the wrist, but that she broke away and ran down the road a distance estimated by her to be between twenty-five and fifty feet; that the defendant ran after her; that she made considerable protests and screamed as loud as she could when the defendant caught up with her; that when the defendant caught her he put his hand over her mouth and said: "You can't do that;" that she tussled with him, and finally got away from him; that in backing up she tripped and fell backward on the ground; that she tried to kick him, although there is no evidence that he attempted to follow up the advantage of her being on the ground; that he took hold of her and assisted her to her feet; that the defendant then tried to calm her down, and that she begged him not to hurt her, and stated that she would give him any amount of money or anything he wanted if he would just let her go. She testified that he had his arms around her waist, but that she broke away again and ran a short distance down the road. According to her testimony he pursued her and caught up with her and then said to her:

"If you run again I will choke you and throw you in the ditch, that's what we do with girls that act like you do."

The defendant strenuously denied the making of any such statement. The complaining witness further testified that she was terribly frightened and became hysterical and begged and pleaded with him, and asked him if he didn't have any mercy or decency about him; that shortly thereafter he said:

"Now, come back to the car, I will take you home."

On direct examination the complaining witness testified that the defendant dragged her back to the car; that he pushed her down on the running board and sat down by her, putting his arms around her and his head on her bust, and that he finally opened the car door on the driver's side and pushed her in and that he then got in beside her. On cross-

examination she testified that she walked back to the car, but very much against her will; that when they got back to the car they sat on the running board several seconds, and that he tried to persuade her to get into the car, arguing with her and begging her so to do, but using no force; that she did not say anything in particular to him; that she did not scream, or fight, or scratch him, or bite, or kick him, or tear any of his clothes; that finally they got up from the running board, and the defendant opened the left-hand door and helped her in. She testified that when she got back into the automobile he told her that he was just going to play around a little bit, but that she didn't remember what she said. She further testified that he told her to lift her dress up above her bust, and that she refused to do so; that he then lifted up her dress; that she pleaded with him not to do so; that as he proceeded to carry out his purposes, she begged him not to do so; that she permitted him to rearrange her position on the front seat of the car, and later on called his attention to the fact that he promised not to hurt her, and that he promised not to have sexual intercourse with her. We deem it unnecessary to recite the details of her testimony. Suffice it to say that we have painstakingly read and reread her testimony with the result that in our opinion it falls far short of proving that resistance which our law requires, unless her failure to resist was excused because of a fear of death or of great bodily harm or unless she was so terrified as to be unable to resist the defendant. It is apparently conceded by the state that her resistance was insufficient to prove the crime of rape unless her acquiescence or submission to the defendant was the result of that fear which our settled rules require. From the testimony of the complaining witness it appears that she was fully cognizant of everything that was going on, fully able to relate every detail thereof, and that she was in no reasonable sense dominated by that fear which excused the "utmost resistance" within her power.

While the evidence is well calculated to arouse keen indignation against the defendant who so persistently and importunately pursued the complaining witness, who at that time was a virgin, it falls short, in our opinion, of proving a case of rape.

For the reasons stated, the judgment and sentence of the municipal court must be reversed and the defendant discharged.

*By the Court.*—Judgment reversed and cause remanded. The warden of the Wisconsin state prison is commanded forthwith to remand the custody of the defendant to the. sheriff of Winnebago county for further proceedings in accordance with the opinion.

FAIRCHILD, J. (*dissenting*). The power to resist may be overcome by threats. When the evidence is sufficient and convinces the jury that the offense was accomplished by that means and against the will of the victim a verdict of guilty should not be disturbed. Here there is evidence of resistance and of an outcry immediately upon the complaining witness getting free from the control of the defendant. As a part of my dissent I desire to record a portion of the opinion of the trial judge. In analyzing the testimony upon motion for a new trial he said:

"The complaining witness was a mild, timid, socially inexperienced female of the age of twenty-six and told a straightforward story which must have impressed the jury. On the other hand, the defendant told a story which was in many of its essentials beyond belief. For instance, the jury may well have doubted his testimony to the effect that immediately upon entering his automobile the complaining witness threw herself at him, caressed him, laid her head on his shoulder, and laid her head in his lap. . . .

"The medical testimony which disclosed that the prosecutrix was of previous chaste character together with her appearance of refinement and reticence disproved this testimony of the defendant completely, and may well have led the

jury to believe that the defendant was ready to testify to anything calculated to exonerate him. . . .

"There is no dispute that after the defendant made several advances toward the complaining witness she got from the car and ran or walked rapidly away from it. Her testimony was that she ran and that when the defendant overtook her and grabbed her by the arm she screamed, that she screamed several times, and that he placed his hand over her mouth to prevent her from screaming. Defendant admits having placed his hand over her mouth, but would have it appear that he did it for some other purpose, although at the time that he did muzzle her he admitted that it was to prevent her from talking so that she could hear him talk.

"The complaining witness also claims that the defendant choked her and threatened her life. The court is of the opinion that the jury very properly believed the version of the story as told by the complaining witness and in so doing disbelieved the statements of the defendant. . . ."

That the complaining witness was in a hysterical condition shortly after her return to the hospital is shown by the testimony of the physician who examined her. Dr. Crabbe testified as follows:

"Her condition, when she came into my room, was that she was absolutely terrified; she was shaking like a leaf and so incoherent it took almost half an hour to make out anything she said. She was very hysterical. I tried to get something out of her; I couldn't understand what happened to her; she was so shaky and so—she mumbled so much, I could hardly make out what was the matter, and finally she told me she had been out, been raped. . . ."

In view of the fact that the evidence was such as to satisfy the jury beyond a reasonable doubt, and also to satisfy the trial judge as set forth above, I believe that this court should affirm the decision below, in reliance upon the judgment of those who saw the witnesses and heard their testimony.

I am authorized to say that Mr. Justice FOWLER and Mr. Justice FRITZ concur in this dissent.