**EWING v. UNITED STATES.**

No. 8308.

United States Court of Appeals for the
District of Columbia.

Decided Dec. 1, 1942.

Writ of Certiorari Denied March 15, 1943.
See 63 S.Ct. 829, 87 L.Ed. ——.

Mr. James J. Laughlin, of Washington, D. C., for appellant.

Mr. Charles B. Murray, Asst. U. S. Atty., of Washington, D. C., with whom Mr. Edward M. Curran, U. S. Atty., Mr. John W. Fihelly, Asst. U. S. Atty., and Mr. John P. Burke, Asst. U. S. Atty., all of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

Appellant was convicted and sentenced for rape. On appeal he complains that: (1) The evidence is insufficient to sustain the verdict; (2) he was not adequately represented by counsel at his trial; (3) there was misconduct in the assistant district attorney's interrogation of a witness; and (4) there was error in the Government's cross-examination of a defense witness, Miss Chamberlin, and in permitting rebuttal of her testimony. The evidence will be recited only so far as is necessary to make the contentions clear.

I. The argument that the evidence does not sustain the verdict seems to take two forms: (1) that it does not show that the act was without the complaining witness' consent; (2) that there was no sufficient corroboration of her story. It is valid in neither respect.

. The girl, a young woman of nineteen, who had come to Washington from Utah within two weeks of the occurrence, gave the only direct testimony concerning the act and the details of its commission. She testified that appellant, fifty-five years old, broke into the bedroom she was occupying, after she retired, and committed the act against such resistance as she could offer until, through force and threats which put her in fear of her life, he overcame her resistance and accomplished his purpose. His only defense and his testimony were, not that she consented, but that the entire incident, including the intercourse, never had taken place. Throughout the trial and during the long hearings held on the motion for a new trial he maintained his denial

of having had relations with the girl or that he had broken into, entered or been present in her room when she said the attack occurred. His story and hers were directly contradictory in this respect, and each was supported by circumstantial evidence, his also by the testimony of Miss Chamberlin, in whose apartment the room was located.

 Yet in one aspect the argument on appeal that the evidence does not sustain conviction is that the girl consented. If this had been the defense, there was evidence which might have brought about a verdict to that effect. But such a view of the event was contradicted both by the prosecutrix' testimony and by appellant's. His denial that the event occurred was wholly inconsistent with any theory of consent. On the other hand, her testimony and the circumstantial evidence supporting it were clearly sufficient, if believed, to show that the intercourse occurred and took place by force and against her will, in the sense that her resistance was overcome by physical force and threats which put her in fear of her life. Some of the details, as she related them, indicated that resistance might have been more sustained and vigorous, alarm and complaint more prompt. They would have been more persuasive factually for appellant if the defense had been consent, though even in that case the issue would have been for the jury to resolve. As it was, their adverse effect, if any, upon the Government's case went primarily to the complaining witness' credibility, more particularly as to whether the force and threats which she said were used in fact had the effect of putting her in mortal fear. Notwithstanding these details, her story was not inherently incredible and, if believed, was sufficient to sustain the verdict's implicit finding that she was put in fear and that the incident occurred in other respects as she said it did. There are cases, especially older ones from other jurisdictions, which seem to require resistance to the victim's ultimate physical powers in order to sustain conviction for this crime.[1] But the law is no longer in this last-ditch stage. Whatever it may have been in other times, it is generally settled now that consent is not shown when the evidence discloses resistance is overcome by threats which put the woman in fear of death or grave bodily harm, or by these combined with some degree of physical force.[2] From a careful reading of both the printed appendix and the voluminous original record, we have no doubt the evidence in this case was sufficient to make out all the elements of the crime, including the necessary want of consent and use of force and threats to overcome the girl's resistance. To hold otherwise would invade the jury's function.

 II. There was ample corroboration of the complaining witness' testimony under the rule of Kidwell v. United States, 1912, 38 App.D.C. 566. In that case this court stated: "We are aware that a conviction for this offense will be sustained upon the testimony of the injured party alone. But where the courts have so held, the circumstances surrounding the parties at the time were such as to point to the probable guilt of the accused, or, at least, corroborate indirectly the testimony of the prosecutrix."[3] 38 App.D.C. at page 573.

---

[1] Cf. State v. Tomlinson, 1861, 11 Iowa 401, quoting one authority as allowing of only three cases: "When narcotics have been administered, when many are engaged against the female, and when a strong man attacks one who has not arrived at the age of puberty," and another as adding "resistance until the helpless female faints from fatigue," and the dread of instant murder. See also State v. Hoffman, 1938, 228 Wis. 235, 280 N. W. 357, 359, upon which appellant relies, where the court recognized that "fear of death or great bodily harm," "fear of great personal injury," "fear that 'so overpowers her that she dares not resist,'" etc., would nullify consent, but found the facts insufficient to show the existence of such fear. Other authorities cited, Jordan v. Commonwealth, 1938, 169 Va. 898, 194 S.E. 719; State v. Shults, 1938, 43 N.M. 71, 85 P.2d 591; State v. Ellison, 1914, 19 N.M. 428, 144 P. 10; State v. Armijo, 1920, 25 N.M. 666, 187 P. 553; Mares v. Territory, 1901, 10 N.M. 770, 65 P. 165, go to the necessity of corroboration and the insufficiency of the particular circumstantial evidence, differing in important respects from that shown here, for this purpose.

[2] Miller, Criminal Law (1934) 295; 1 Wharton, Criminal Law (12th Ed. 1932) § 701.

[3] Appellant's contention is obviously untenable, that the Kidwell case is distinguishable from this one, in respect to the necessity and sufficiency of corroboration, because the prosecutrix in that case was under the age of consent.

636

Appellant's argument in terms requests that we "inquire again into the whole theory of the necessity of corroboration" and, in effect, reverse the rule stated in the Kidwell case, substituting one which requires "direct corroboration of the prosecutrix." If by "direct corroboration" is meant the testimony of an eyewitness, the result would be in most cases that conviction could not be had except upon the defendant's confession. If it means less than that, it is hard to see how it could relate to anything other than circumstantial evidence which supports the prosecutrix' story, and this is what the Kidwell case requires. Lord Hale's aphorism concerning these accusations still is valid and for that reason, as the Kidwell case declares, "it is the duty of the court to carefully safeguard the defendant at every stage of the proceeding, and secure to him a trial legal in all respects." Hence corroboration, in the sense that there must be circumstances in proof which tend to support the prosecutrix' story, is required, and for lack of it Kidwell's conviction for one offense was reversed.

But to safeguard the defendant by requiring corroboration in this sense is one thing. To throw around him a wall of immunity requiring the testimony of an eyewitness or "direct evidence," which is more than circumstantial, in support of the prosecutrix' story, is another. We are satisfied that the rule stated in the Kidwell decision is one which should not be overthrown.[4]

■ We shall not state the corroborating circumstances in detail. They are found in the proof, among other things, that appellant was present in Miss Chamberlin's apartment visiting with her and the prosecutrix shortly before the crucial time, and spent the night either in the living room or in a room across the hall; that force was used against the bedroom door, making a new break in the already defective lock, with no other evidence to explain the new condition; that complaint was made to friends within twelve hours, cf. Roney v. United States, 1915, 43 App.D.C. 533, 535, to the police within twenty-four, cf. Lyles v. United States, 1902, 20 App.D.C. 559, 563; and was followed shortly by appellant's arrest and confrontation with the prosecutrix. His conduct when first arrested and questioned also might have been regarded as corroborative to some extent. Medical evidence established that the girl had recently had intercourse for the first time and within such a period that the jury could find it occurred on the night in question, cf. Lyles v. United States, supra. Physical exhibits and medical testimony established the presence of blood and spermatazoa upon clothing the girl wore that night after she retired; and several witnesses with whom she discussed the matter on the following day testified to her unusually nervous and distraught condition. There was an entire absence of proof of any motive on her part to charge appellant with the offense other than the reason she gave; and her statements made first to the police, then at the preliminary hearing, and finally at the trial were essentially and substantially consistent. Nor were they shaken by vigorous cross-examination. Other circumstances, which need not be set forth also corroborated her testimony.

As against these circumstances were others, as we have stated, which tended to corroborate the appellant's version, that he had not had intercourse with the woman, and still others the view that the intercourse was had with her consent. But, regardless of this inconsistency, the entire evidence tending to appellant's advantage did not deprive the circumstances proved in support of the girl's story of corroborative effect. It merely created conflict with them. Within the prevailing rule, stated in Kidwell v. United States, there was sufficient corroboration.

■ III. Appellant was represented at his trial by five attorneys, including his son who did not enter formal appearance. The brief concedes his chief counsel was and is "a civil lawyer of ability and distinction" and that the principal associate "is an expert criminal lawyer with many years of experience." In view of these concessions we agree with present counsel, who came into the case only when the motion for a new trial was pending, that "with such an array of counsel to make the allegation that he [appellant] was not adequately represented would seem to come under the heading of 'Believe it or Not' or 'Strange as it Seems.'" Perhaps this should suffice to dispose of the contention.

---

[4] Wigmore, Evidence (1940) §§ 2061-62; 2 Wharten, Criminal Evidence (11th ed. 1935) §§ 916, 920.

But much is made of the fact that few objections were made and fewer exceptions were taken in the course of the trial. The contention is not one of general incompetence. It is rather that the attorneys conducted the trial in this case incompetently.

The same argument was presented at great length upon the motion for a new trial. The trial court, with inexhaustible patience, heard testimony and argument concerning it. In deciding that motion, adversely to appellant, the court filed a memorandum which deals in detail with appellant's principal specifications and gives the court's reasons for concluding they did not show incompetence. In one case it appeared that leading counsel had not informed co-counsel of the Government's offer to make certain evidence available to the defense, and the fact came out in co-counsel's argument to the jury. Correction followed immediately. The court properly characterized the incident as "some slip of this kind, not going to the real merits of the case," and found it inconceivable that such an occurrence should have prejudicial effect. Another instance involved the making of a stipulation concerning medical evidence, too lengthy, with the circumstances which induced its making, to delineate here. The stipulation was, certainly in one respect and probably in others, highly beneficial to the accused, and his counsel so regarded it. They made effective use of it, both in evidence and in argument. It was made with the court's permission, without objection by the appellant when it was presented in evidence and, according to counsel, represented their sound judgment concerning what was to his advantage. It was urged also that incompetence appeared from the failure to call certain persons as witnesses for the defense. In each instance the court found, as it did regarding the stipulation, that the matter was one properly for the exercise of counsels' judgment and that there was no basis for finding negligence or incompetence in what they did. In one case counsel refrained from using the witness, an aged and infirm man, because he had given different versions on different occasions, his recollection of details was wavering and uncertain, and counsel's judgment was that he could not be relied upon to give them upon the witness stand as he had related them before the trial. Another witness was not put on because her testimony would have contradicted in one respect the testimony of Miss Chamber-lin, the most important witness supporting defendant's testimony. Similar considerations, going to credibility, recollection, cumulative effect, the creation or avoidance of conflict in the case for the defense, and other matters critical to the value of a witness' testimony, presented questions for the exercise of the judgment of counsel. The court found, in each case, that this had been applied without any basis for believing it had been done negligently or incompetently.

From our reading of the record, we think the argument for incompetence comes down to not much more than that present counsel, aided by the hindsight afforded by an adverse verdict, would not have tried the case in the respects specified as it was tried, and that the sum total of these differences in judgment amounts to incompetence on the part of the trial attorneys. As against this view, we are convinced, as was the trial court, that appellant was represented throughout his trial and in preparation for it diligently, assiduously and competently. In this respect the trial court's statement, which may be taken as a finding, was: "At no time prior to or during the course of the trial was any representation made to the Court, nor did anything occur which would lead the Court to believe, that the defendant considered his counsel, or any of them, unsatisfactory or other than highly competent." Appellant selected his own attorneys. The charge of incompetence was not made until after the verdict and the original motion for a new trial had been filed, also after present counsel entered the case. Chief counsel at the trial continued to represent appellant in the early stages of the new trial proceedings. When he withdrew, it was at his own request, with the court's permission, and against the expressed wishes of appellant and his present attorney.

Finally, incompetence is not shown, as is argued, by the existence of error concerning the specific matters now relied upon for reversal, first, because, as later appears, the errors do not exist; second, because the mere presence of specific error is not enough in itself to show incompetence. We find no basis for differing from the trial court's conclusion that none of appellant's specifications supports this charge against his attorneys.

Near the close of the long hearing on the motion for a new trial, the charge of

inadequate representation took a sudden and entirely new turn. The hearings had been unduly extended. Long but futile expeditions in search of newly discovered evidence had been made. The hearing had been continued over and over to allow some supposed new lead to be followed out. All failed. When after all this a final continuance had been granted at appellant's special, personal urging, but with the court's insistence that the hearings be brought to an end, appellant's affidavit was filed. So were counteraffidavits. Appellant then insisted on cross-examining those who made them. The court was reluctant to extend the hearings further, but because of appellant's plea took under advisement the question whether to determine the matter upon the affidavits alone or to hear further oral testimony. At the next sitting the court brought the hearings to a close without taking further testimony, and announced its ruling adverse to appellant upon the motion for a new trial, having determined the question last presented upon the affidavits alone. Appellant assigns this not only as error, but as a violation of constitutional right.

■ There is authority that issues of fact presented upon a motion for a new trial may be determined on affidavits alone.[5] We need not decide whether, if the new charge had been timely made, this would have been sufficient, though we do not intimate that it would not be. In view of all the circumstances, and especially the fact that the charge came at the end of the already extended hearings, it was not an abuse of discretion for the court to determine the matter upon the affidavits without more.

■ IV. Appellant next urges that there was misconduct by one of the prosecuting attorneys in asking the defense witness Simmons the following questions upon cross-examination:

"Q. On the 25th of October, Saturday the 25th of October, Saturday before this particular occurrence that he is being tried for here, didn't the defendant say to you, 'Let's get some whisky and go to the Whitestone and get some of the girls and have a party tonight'? A. No, sir.

"Q. He didn't say anything like that? A. No, sir."

The Government says the purpose of the question was to disclose personal and social relations between the witness and the appellant for purposes of impeaching the former's credibility. Cf. Alford v. United States, 1931, 282 U.S. 687, 691, 692, 51 S.Ct. 218, 75 L.Ed. 624. The question may have been of doubtful propriety for this purpose, in the absence of factual background or foundation which could have been made or attempted with inquiries directed to the relations of the men but less effective by way of innuendo. However, in view of the witness' negative response and later corroboration in this respect by the appellant, it is difficult to see how there could have been substantial harm from the mere asking of the questions. No objection was made, probably for the obvious reason that counsel preferred having the witness answer to possibly creating an unfavorable impression by shutting off response through objection. It may have been considered too, as well might have been true, that the question when answered would have boomerang effect upon the prosecution. At any rate the matter was dropped at once, and it cannot be assumed the jury would accept the question, twice denied, as evidence by innuendo contrary to the denial. The colloquy was not sufficiently important, in light of the setting and the answers, to make the court's failure to intervene of its own motion ground for reversal.

V. Both sides concede the most substantial issue arises from the Government's cross-examination of Miss Chamberlin and the rebuttal of her testimony by the complaining witness' mother.

Appellant and Miss Chamberlin were joint owners and operators of the building in which her apartment was located. Her living room was used also for business purposes, as an office in operating the building. Adjoining it was the bedroom where the attack occurred. Both appellant and Miss Chamberlin came to Washington originally from Utah about 1933. She and the prosecutrix' mother were old friends. The girl arrived here about two weeks before the attack. Previously her mother had written Miss Chamberlin to expect her arrival. When she came, Miss Chamberlin allowed her to occupy her bedroom temporarily. Miss Chamberlin continued to use the living room, sleeping there on a

5 Hillman v. United States, 9 Cir. 1911, 192 F. 264, 272, cert. denied, 1912, 225 U.S. 699, 32 S.Ct. 834, 56 L.Ed. 1263;

Chetkovitch v. United States, 9 Cir. 1931, 53 F.2d 26.

cot or day bed. Just prior to the attack, she, appellant and the girl visited in the living room for twenty or thirty minutes. The prosecutrix retired to the bedroom. According to the girl's testimony, Miss Chamberlin left the apartment before she went into the bedroom, and the clear inference is that her hostess did not sleep in it that night, but occupied a room across the hall. She testified in effect that appellant slept in the living room after the attack. On the other hand, the testimony of both appellant and Miss Chamberlin was to the effect the latter slept there from the time the visit ended until early morning, and that appellant occupied the room across the hall. Miss Chamberlin testified, in brief, that she was in the living room during the entire period when the girl said the attack had occurred, that she was a light sleeper easily awakened by noises, that appellant left the apartment before the prosecutrix and she retired for the night, occupied the room on the other side of the hallway, and did not return to the apartment until after they had arisen in the morning. She further stated he could not have broken into the bedroom, committed the offense, and done the other things afterward to which the girl testified, without her knowing of these things and, in effect, that they did not occur.

Enough has been stated to show that Miss Chamberlin's testimony was vital to the defense. It strongly supported appellant's case and contradicted the prosecuting witness' version. If believed, it destroyed the Government's case and required a verdict of not guilty. But it was contradicted in many respects, not only by the prosecutrix directly but by other evidence, much of it circumstantial. In this state of the proof, Miss Chamberlin's credibility became a major factor, as of course also was that of appellant and of the girl.

In her examination in chief Miss Chamberlin was not questioned about a trip to Utah which she made within two or three weeks after the attack and appellant's arrest. Upon cross-examination the Government interrogated her concerning this trip and an interview she had during it with the girl's mother at her home. Miss Chamberlin admitted having had the interview. Thereupon the following questions were asked, with answers as stated:

"Q. Now, in that conversation, did Mrs. C. ask you if you thought Ewing was guilty and didn't you say Yes? A. No, she didn't.

"Q: In that conversation didn't you say to her that Ewing was facing the electric chair and that you would have to be on his side? A. No. I told her he was facing the electric chair. I told her I would have to tell my story as I knew it irrespective of who it affected."

Subsequently the Government called the girl's mother and interrogated her concerning the interview, with answers, as follows:

"Q. On that occasion did you look at Miss Chamberlin and point and say this: 'Do you believe that Mr. Ewing is guilty of raping my daughter,' and did she say, 'I do believe it'? A. Yes, she did.

"Q. Did she further say on that occasion, 'He is facing the electric chair and I have got to be on his side'? A. Yes."

Appellant urges it was highly prejudicial to permit this cross-examination and rebuttal. The principal contention is that the cross-examination went beyond the scope of the direct examination into a collateral matter, and therefore the Government was bound by the witness' answers, so that it was improper to allow the rebuttal. It is said also that the court erred in permitting the Government "to get in evidence the opinion of a witness" and in allowing this to be done through leading questions.

The objection that the questions were leading is hardly substantial in these circumstances. Cf. 3 Jones, Evidence (3d ed. 1938) § 845; 3 Wharton, Criminal Evidence (11th ed. 1935) §§ 1270, 1357; Underhill, Criminal Evidence (4th ed. 1935) § 389; Nash v. Fidelity-Phenix Fire Insurance Co., 1929, 106 W.Va. 672, 146 S.E. 726, 63 A.L.R. 101; State v. Kuhl, 1918, 42 Nev. 185, 206, 175 P. 190, 197, 3 A.L.R. 1694.

The objection that the cross-examination related to collateral matter and therefore the Government was bound by Miss Chamberlin's answers was presented to the trial court on the motion for a new trial. In this respect it said: "The statements about which Miss Chamberlin was questioned, and as to which Mrs. C. testified were clearly inconsistent with the testimony which Miss Chamberlin gave respecting actions of the defendant at the time of the alleged offense. Furthermore, such

statements can have no meaning other than could as well be expressed by the words, 'Even though I believe him to be guilty, he is facing the electric chair, and I have got to be on his side.' It is clearly recognized that inquiries on cross-examination as to the bias of a witness are not irrelevant to the issue in the sense that the cross-examiner is concluded by the answer. * * * It is difficult to think of evidence more relevant to the question of bias, for the purpose of the impeachment of a witness, than the testimony here in question."

▇▇▇▇ The ruling was correct. It is true, as appellant contends, that generally the inquiring party is concluded by the witness' answer when cross-examination relates to a matter collateral to the issues, and he may not later rebut it for purposes of impeachment.[6] It is also true, as the Government urges, that a witness may be cross-examined as to facts tending to show bias for or against a party, or his willingness to be unscrupulous in giving testimony, for impeachment purposes;[7] that bias may be shown by extrajudicial statements of the witness from which an inference as to his feelings toward a party may be drawn[8] and by extrinsic evidence independently of cross-examination;[9] and that the witness may be contradicted, if he denies having made such a statement.[10]

The respective contentions, stated thus abstractly, present an apparent paradox. Each contains an ambiguity with reference to the other. Under the prosecution's view, if the matter inquired about shows bias or prejudice, the fact it is collateral is im-material. Under appellant's, if the matter is collateral, the cross-examiner is concluded by the answer, regardless of whether the subject matter relates to the witness' bias or prejudice. In this formulation, the rules conflict.

The difficulty is with the formulation, more particularly of appellant's viewpoint. The commonly accepted broad statement of the rule is: "No contradiction shall be permitted on 'collateral' matters." Cf. 1 Starkie, Evidence (1824) 190; 3 Wigmore, Evidence (3d ed. 1940) §§ 1003, 1020. But as the latter authority points out the term "collateral" furnishes no real test; without more, it is a "mere epithet," a catchall designation to cover specific illustrations based upon "idiosyncracies of individual opinion."[11] Without further pinning down, it can mean no more than the matter inquired about is not logically relevant, independently of "pure" impeachment, to the issues or cause on trial or is so only in so remote and indirect a manner that the authoritative tribunal thinks it should not be inquired into in a case of contradiction by extrinsic testimony or, in one of self-contradiction, further than to make inquiry of the witness.[12] Logically, it would seem, if the test is one of "collateralness in fact," it should be the same for both cases. But whether so or not, the apparently prevailing approach is "to invoke simply the term 'collateral,' and to decide according to the circumstances of each case."[13]

However, since Attorney General v. Hitchcock, 1 Exch. 91, 99 (1847),[14] the test in England and in the better considered

[6] 3 Wigmore, Evidence (3d Ed. 1940) § 1003, and authorities cited in note 3; Thompson-Starrett Co. v. Warren, 1912, 38 App.D.C. 310, 315; cf. Martin v. United States, 1942, 75 U.S.App.D.C. 399 127 F.2d 865.

[7] Alford v. United States, 1931, 282 U.S. 687, 693, 51 S.Ct. 218, 75 L.Ed. 624; District of Columbia v. Clawans, 1937, 300 U.S. 617, 630, 57 S.Ct. 660, 81 L.Ed. 843; United States v. Glasser, 7 Cir., 1940, 116 F.2d 690, 702, reversed on other grounds, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Economon v. Barry-Pate Motor Co., 1925, 55 App.D.C. 143, 144, 3 F.2d 84, 85; 3 Wigmore § 1022; 3 Wharton, Criminal Evidence (11th Ed. 1935) § 1346; Underhill, Criminal Evidence (4th Ed. 1935) § 401, at 810.

[8] Attorney General v. Hitchcock, 1847, 1 Exch. 91, 100, 154 Eng.Rep. 38, 42;

Hoagland v. Canfield, C.C.S.D.N.Y.1908, 160 F. 146, 170; 3 Wigmore § 948 ff.

[9] United States v. Schindler, C.C.S.D.N.Y.1880, 10 F. 547, 549; Hoagland v. Canfield, C.C.S.D.N.Y.1908, 160 F. 146, 170; 3 Jones, Evidence (4th Ed. 1938) §§ 828, 845; 3 Wigmore § 948.

[10] Ibid.

[11] He also notes that some courts use the terms "material" or "relevant," rather than "collateral," to indicate the matters that may be the subject of "prior self-contradiction"; but that all these terms are subject, without more, to the infirmity of being "too indefinite to be useful." § 1020, at 692.

[12] 3 Wigmore § 1023.

[13] Id. § 1003, note 3, and authorities cited.

[14] "It must be connected with the issue as a matter capable of being distinctly given in evidence, or it must be so

American cases[15] has been reduced to more definite and less idiosyncratic form. This is, as Wigmore phrases it, for cases of contradiction by extrinsic evidence, "Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?"; for cases of self-contradiction, "Could the fact, as to which the prior self-contradiction is predicated, have been shown in evidence for any purpose independently of the self-contradiction?" 3 Evidence (3d Ed. 1940) 657, 692.

In the present case, we think it is immaterial which of these formulations is applied, since the facts concerning which the complaining witness' mother testified could have been proven under either, not to make out part of the Government's case in chief before Miss Chamberlin testified, but afterward, because those facts, if true, not only went to impeach her veracity generally or credibility in relation to some matter not directly involved in the issues, but to destroy everything she had said as a witness in appellant's behalf and as well to contradict his own testimony as to the most crucial facts in the case.[16] But for possible objections on technical grounds, noted later, the impeaching witness might have been called to prove what she related, even though Miss Chamberlin had not been questioned about it. However, since the question arose actually as a matter, in the first place, of self-contradiction, the latter formulation of the rule is the properly applicable one.

To make the application clear, it is necessary to point out a common misconception, in which appellant indulges. It has been stated as follows: "Moreover, the rule is often misunderstood. Courts are found phrasing the test of admissibility in this way: "Would the cross-examining party be entitled to prove it as a part of his case, tending to establish his plea?", or "Whether the question, the answer to which is proposed to be contradicted, would

be admissible if proposed by the party calling him?" These are accurate enough as far as they go; but they omit to provide for an important class of matter clearly admissible, namely, facts relating to the bias, corruption, or other specific deficiencies of the witness. It is not merely matters which are a "part of the case" that may be the subject of a self-contradiction, but *any matter which would have been otherwise admissible in evidence.* The simple test is (in the language of Chief Baron Pollock) whether it concerns "a matter which you would be allowed on your part to prove in evidence" independently of the self-contradiction,—i. e. if the witness had said nothing on the subject. 3 Wigmore § 1020.[17]

Applying "the simple test" to this case, it seems clear the facts proved by the impeaching witness could have been shown, either in contradiction or self-contradiction of Miss Chamberlin, at any time after she testified on direct examination. Before then or as a part of the Government's case in chief they would have been objectionable as hearsay. The fallacy in appellant's contention is that he would determine whether matter is "collateral," and therefore the cross-examining party is bound by the witness' answer, solely by reference to whether it would be or would have been admissible as part of that party's case in chief. In other words, he would ignore the fact that the witness has testified. That makes all the difference in the world. It makes admissible facts, both concerning which the witness speaks and concerning which he does not speak, for impeachment purposes. The mere fact the matter is offered for impeachment does not make it "collateral." Nor does the fact alone that the witness speaks concerning it make it not so. But when it goes to challenge directly the truth of what the witness has said in matters crucial or material to the issues on trial, by no process of reason can it be held "collateral." If it

---

far connected with it as to be a matter which, if answered in a particular way, would contradict a part of the witness' testimony."

[15] See authorities cited in 3 Wigmore § 1003, note 2; § 1021, note 1.

[16] See Kidwell v. United States, 1912, 38 App.D.C. 566, 571: "While it is true that it is immaterial whether or not the prosecutrix had sexual intercourse with men other than defendant, if defendant was also guilty, yet, if evidence had been ad-

mitted tending to prove this fact in this particular case, it would have amounted to more than an attempt to impeach her testimony upon a collateral point. It would have extended to facts which materially corroborated prosecutrix's testimony".

[17] The author also notes another misconception, that nothing said on examination in chief can be collateral and therefore self-contradiction can be had of any part of it.

is of that character, it is admissible either by way of cross-examination or by way of contradiction, without regard to whether the witness has been asked and has made answer concerning it, unless some over-weening rule of exclusion throws it out.

The facts involved here are of that character. Miss Chamberlin testified, as has been shown, to facts of her own knowledge, which if believed, required the jury to find defendant not guilty. According to her statement of the facts, she was present in the apartment during the whole period when the prosecutrix said the attack occurred and afterward when the latter claimed she and then appellant made use of the bathroom, located off the living room, and of that room itself; appellant was not in the apartment, and could not have been there without her knowledge during any of this period; nor could the attack or other incidents have occurred without her knowing of them. She denied they took place. Her testimony, summed up, was that defendant was not guilty. No other conclusion could be drawn from it if it was believed.

When, after this, it was proposed to prove she had declared before the trial and shortly after the offense that defendant was guilty, the tendered proof was anything but "collateral." It was a knife thrust at the whole of her testimony, effective to tear it to shreds, if believed. It may have had that effect. Until Miss Chamberlin testified this statement would have been open to objection, not for want of probative force, but as hearsay and possibly upon other grounds of policy. But when she was called and testified almost as an eyewitness, in the negative sense, to the most material facts in issue, this objection disappeared. Both she and the impeaching witness became available for cross-examination. The appellant was no longer in danger of prejudice from unsworn statements made out of court with no opportunity to test their truth by the advocate's art of search. Nor was the statement any longer subject to objection that it was not the best evidence. Finally, in the setting framed by Miss Chamberlin's testimony, it lost all character as a mere expression of the witness' opinion, and became an assertion of fact, one effective to contradict almost every crucial specific fact to which she had testified and the ultimate conclusion of fact she intended the jury to draw from them.

It is true the questions, both on Miss Chamberlin's cross-examination and in the interrogation of the prosecutrix' mother, were framed in terms, in the one case, of "if you thought" [appellant was guilty] and, in the other, of belief. And appellant strenuously contends that the effect of permitting answer was merely to prove Miss Chamberlin's opinion concerning the ultimate issue the jury was to decide, thus invading its function. The simple answer is that for one situated as Miss Chamberlin was, or claimed she was, belief and knowledge of the facts were synonymous. She was not expressing a mere conclusion of law or an ultimate conclusion of fact unrelated to personal knowledge of all that had taken place. Without extending the matter further, we append in the margin citation of authorities which sustain these views.[18]

It should be added that if the various statements attributed to Miss Chamberlin were to be treated as distinct declarations rather than as parts of a single whole, the statement, "He is facing the electric chair," amounts to no more than an assertion that appellant had been charged with a crime for which the death penalty might be imposed, and of the reason for the concluding declaration, "I have got to be on his side." The latter does not directly contradict the facts to which Miss Chamberlin had testified in chief, as did the expression of belief in appellant's guilt, other than by way of affecting her credibility as showing bias in his favor. For the latter purpose, however, the statement was admissible within the rule of self-contradiction, stated above, and directly within commonly accepted rules of impeachment. In other words, even if Miss Chamberlin had said nothing as a witness or on cross-examination concerning having made this remark, proof that she had done so was, admissible,[19] more especially in the light of. her close business and social relations with appellant,[20] to throw light on what weight

[18] 3 Wigmore § 1041; Delaware L. & W. R. R. v. Converse, 1891, 139 U.S. 469, 11 S.Ct. 569, 35 L.Ed. 213; Mayer v. People, 1880, 80 N.Y. 364; State v. Baker, 1927, 318 Mo. 542, 300 S.W. 699; State v. Matheson, 1905, 130 Iowa 440, 103 N.W. 137, 114 Am.St.Rep. 427, 8 Ann.Cas. 430; Note 1930, 66 A.L.R. 289.

[19] 3 Wigmore § 1022.

[20] Id. § 949; Rasnake v. Commonwealth, 1923, 135 Va. 677, 115 S.E. 543;

should be given her testimony. Showing bias in such circumstances was analogous to showing interest of the witness in others, for this purpose. It is immaterial, therefore, whether the statements attributed to Miss Chamberlin be regarded separately or as merely parts of a single whole. In the latter case the assertion, "He is facing the electric chair," is at most a reiteration of the statement, "Yes, I believe he is guilty."

We may add also that there are two principal reasons which underlie the limitations imposed upon the admission of collateral matters. One is to avoid confusion of the issues and undue extension of the trial. This is essentially a matter of administrative policy and concentration of attention. The other is a rule of fair play, when the matter is one of self-contradiction, to give the witness warning in order that he may be able to meet without surprise questions concerning matters not anticipated and, if possible, explain them.[21] The latter does not apply except when the inquiry is one involving self-contradiction.[22] In addition to these two a third has been mentioned at times, that conviction for perjury could not be secured in relation to matters clearly collateral or irrelevant.[23] These are the major policies underlying the rule. No one of them would call for the exclusion of the evidence now in question. Miss Chamberlin could not have been surprised by the inquiries, nor did she exhibit any. She admitted the interview and a part of the statement attributed to her, denying the remainder. The inquiries could not have confused the issues, because they related to the very heart of the facts already in evidence and Miss Chamberlin's own previous testimony. We need not express an opinion concerning the matter of perjury. Apart from that (and it is, perhaps, no longer a major consideration), none of the underlying policies requiring the exclusion of collateral matter or binding the party examining not to contradict the answers made regarding it requires exclusion of this subject matter.

A word of caution is necessary. It is not intended to rule that whenever a witness has testified in behalf of a party he may be impeached by inquiring, either of him or of another, whether he has stated the party is guilty. In many situations differing from that presented here such evidence may not be admissible. It is highly prejudicial when the witness proving it is important for the issues to be decided or one apparently of high credibility. Our present ruling is limited to the facts of this case, and similar situations, where the circumstances are such that the declaration takes on the character of a statement of fact or of facts in a nutshell, rather than merely that of the witness' opinion or conclusion drawn from facts of which he does not have knowledge or has only such partial knowledge that the element of opinion outweighs the factual effect of the statement.[24]

Finally, from what has been said, it appears that there was no basis for the charge of incompetence made against the trial attorneys in connection with these assignments of alleged error. The record shows that they regarded these inquiries as proper, and therefore made no objection. They investigated the law, and the result has justified their judgment.

There being no error, the judgment must be affirmed.

GRONER, C. J., concurring in the result. I am in agreement with all that is said in the opinion of Judge Rutledge, save in one respect. In that respect, my disagreement can be stated in a few words. I think it was error to have allowed a witness for the Government to testify that, in a conversation with one of defendant's witnesses, the latter had expressed the opinion that the defendant was guilty of the crime for which he was on trial. When Miss Chamberlin, defendant's principal witness, was on cross-examination the District Attorney asked her whether, on a visit to Utah, she had called on the mother of the prosecutrix, and conversed with her. She replied she had. She was then asked:

"Question: Now, in that conversation, did Mrs. C... ask you if you thought Ewing was guilty, and didn't you say Yes? Answer: No, she didn't."

At the close of defendant's evidence Mrs. C... was called and sworn and was asked:

---

United States v. Schindler, C.C.S.D.N. Y.1880, 10 F. 547.

[21] 3 Wigmore §§ 1025-29.

[22] Id. § 1023.

[23] Id. § 1007, citing, Blakey's Heirs v. Blakey's Executrix, 1859, 33 Ala. 619.

[24] Cf. Yeager v. U. S., 16 App.D.C. 356 (1900), See 3 Wigmore § 1022.

"Question: On that occasion, did you look at Miss Chamberlin and point and say this: 'Do you believe that Mr. Ewing is guilty of raping my daughter,' and did she say, 'I do believe it'? Answer: Yes, she did."

I am unaware of any rule, old or new, which permits receipt in evidence of a witness's opinion as to the guilt or innocence of the accused. I have always understood that question to be exclusively for the jury and that any invasion of their right to determine the question solely on the facts was improper, whether coming from the judge or from a witness. The statement attributed to Miss Chamberlin could have been treated by the jury only as substantive evidence of her belief of defendant's guilt, and considered in that light I think there can be no doubt of its inadmissibility. However far some recent cases may have gone in allowing such evidence for purposes of contradiction, it is clear that was not its purpose here, nor do I think the court could have found a phrase to limit its use to that purpose. For as Mr. Justice Cardozo said in Shepard v. U. S., 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196:

"Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds."

I am therefore unwilling to accept, as a rule for the future, either the conclusion of the majority in this respect or the reasoning on which it is sustained.

My concurrence in the result is because the record in this case shows that the testimony to which I have referred was given without objection or exception. Nothing was said to call the trial court's attention to the subject by motion or otherwise during the trial, and there is no bill here to bring the matter to our attention. Appellant was represented by prominent counsel of his own selection. For reasons satisfactory to themselves they allowed this evidence to be given without protest. While I am mindful of the rule frequently expressed by this court that we reserve at all times the right, in our discretion and on our own motion, to notice error in criminal cases, in the present case an inspection of the entire record, including the testimony of all the witnesses, satisfies me that the circumstances are not such that that discretion should be exercised.