B——, Plaintiff in' error, vs. THE STATE, Defendant in
error.

*December 8, 1917—January 5, 1918.*

*Rape: Degree of resistance required: Evidence: Sufficiency.*

1. In order to constitute the crime of rape there must be not only
   lack of consent but the utmost resistance by all means within
   the woman's power.
2. What constitutes the utmost resistance in a particular case must
   depend largely upon the facts of that case, such as the tempera-
   ment of the victim, the relations of the parties, her state of
   health, her physical strength, her age, her experience, her cour-
   age, her nervous condition at the time, and perhaps other cir-
   cumstances naturally affecting her powers of resistance. *Brown
   v. State*, 127 Wis. 193, and *McLain v. State*, 159 Wis. 204, ex-
   plained and reconciled.
3. Upon the evidence in this case, so grave a doubt remains as to
   whether the prosecutrix made that resistance which the law re-
   quires in view of all the surrounding circumstances, that a con-
   viction of the crime of rape is reversed.

ERROR to review a judgment of the circuit court for Dunn
county: A. H. REID, Judge. *Reversed.*

The plaintiff in error (hereinafter called the defendant)
was convicted of rape and brings error to reverse such con-
viction. The information contained two counts, one .for
rape, and the other for adultery. The crime is charged to
have been committed on Sunday, September 3, 1916, at the
office of the defendant, a practicing physician in the city of
Menomonie. The defendant is a married man, thirty-six·
years of age, with two children, who has practiced his pro-
fession at Menomonie for more than thirteen years. The
prosecutrix, a girl seventeen years of age, weighing about 100
pounds, went to the defendant's office on Saturday, Septem-
ber 2, for the treatment of a mole or birthmark on her face.
The defendant had treated the complaining witness profes-
sionally and her father several times before. The office was

in the second story of a business block on one of the main streets of the city and consisted of three front rooms connected together. The defendant treated the birthmark with nitric acid, and it was arranged that the girl should return on the following day between 11 and 12 o'clock in order that the doctor might observe the progress of the treatment. She returned at the time appointed on Sunday. Some patients were receiving attention, and she waited in the reception room until they were attended to and went away, and then went into the treatment room, being the east room of the suite, and the doctor examined the mole, squeezed it, and had her lie down upon the operating table in order (as he claims) to have a better view of it. At this point the stories of the prosecutrix and the defendant radically differ, the prosecutrix claiming that the rape was committed, and the defendant denying that any such thing took place. The prosecutrix left the office and walked home, and complained to her mother (using the German language, which was the language used in the family) that B—— was on top of her. The girl and her father immediately went to the defendant's office and had an excited conversation with him. The district attorney was consulted, just when does not appear, but a warrant charging assault with intent to commit rape was issued by Judge P. B. CLARK of the municipal court of Dunn county December 18, 1916, and a preliminary examination held ten days later before Hon. J. W. MACAULEY, county judge, sitting as judge of the municipal court on account of the filing of an affidavit by the district attorney that Judge CLARK was a necessary and material witness for the state. A full examination was had and Judge MACAULEY held that the evidence did not show a crime to have been committed and discharged the defendant. In February, 1917, a second preliminary examination was had before Hon. GEORGE THOMPSON, circuit judge, upon a complaint and warrant charging rape, and on this examination it was found that an offense had been com-

mitted and that there was reasonable cause to believe the defendant guilty, and he was bound over for trial.

The story of the prosecutrix is substantially as follows: She went to defendant's office on Saturday and was taken into the east room. The doctor put some medicine on the birthmark, and sent her back into the waiting room to wait and see how it worked. After a while he came out and looked at it, and asked her if it burned, and she said it did terribly, and then he sat down in a chair and took her on his knee, and she got up right away. He told her to step in tomorrow; there would be no charge for it. She did not think there was anything wrong about his taking her on his knee because she thought he wanted her not to think of the pain. She told her mother about it when she went home, and her mother thought that it was nice of him to make her not think of the pain. When she came to the office on Sunday there was only one other patient there, namely, a boy who after being treated went away, and the doctor took her into the same room as before and sat her in a chair and told her to take her bonnet off. Then he came up behind her and squeezed the birthmark, and she thought that was all he was going to do, and got up and reached for her hat, when the doctor grabbed her and slammed her on the table (an operating table twenty-two inches wide, on casters) and was right on top of her, pushing up her skirts and holding her left hand with his right. She tried to get away, fought all she could, struggling and twisting, trying to strike him and push him off. Her right leg fell off the table, and he put it on again, and when he got his organ into her private parts she said, "You hurt me." When he got off she put on her hat and went home, feeling as if she would vomit, and so weak she could hardly walk, and told her mother B——— was on top of her. Her mother at once told her father, and she and her father at once went back to the doctor's office. She wore short dresses and was quite lightly dressed; her undergarment was a combination suit, waist,

and loose drawers buttoned in front and back.    The drawers were not unbuttoned, torn, removed, or soiled.    Her right leg was lame for a week.    She did not scream because he leaned so heavily on her that she was just like choked and she was afraid of him, he was so rough.

The defendant's version is substantially as follows: On Saturday he put some nitric acid on the birthmark, and allowed it to act for a few moments, and had her wait in the waiting room while he attended to another patient, and then examined it again, and was afraid he left the acid on too long, and he then told her to return on Sunday and let him see it again.    She was standing near his chair with tears in her eyes, and complaining of its hurting her, and he took hold of her hand and she sat on his lap, half crying, and he to pacify her said, "Kiss me," which she did, and then got up and went home.    When she came Sunday she was the last patient. It was warm, and the windows were open, and he took her into the east room and sat her on a chair, squeezed the blemish a little, told her to take her hat off, pulled the table out from the wall, and told her to get on the table so that he could have a better light, and she did so.    He examined it with a magnifying glass, put some ointment on it, told her to get up, which she did, and got off the table.    She seemed to be worried for fear it had been burned too much, and he tried to reassure her by telling her it would be all right, and took her by the hand, and as he tilted back his chair she sat on his lap and put her arm around his shoulder, whereupon he tilted his chair back again, and said "this will never do," and apologized to her and got up and went to his desk in the next room. As she started to go home she came into the room where he was and said, "I am mad at you," and he said, "You have no reason to be mad at me, I have apologized to you and that is all I can do," and she went out.    This was the entire transaction.

It is undisputed that the prosecutrix and her father came

back to the office within a few minutes, while the defendant was treating another patient, and met the doctor at the head of the stairs, and that an excited conversation took place. The prosecutrix and her father agree that the father asked the defendant "Are you a doctor or a beast?" and that defendant said, "Keep quiet and have sense," and the father said, "I have sense, but you haven't got any; use a girl like that right in the office; if you want it so bad go to the cities and pay for it;" that the doctor took them into Dr. Steve's office, opening off from the same hall, and sat down on a couch and cried, and said, "I don't know why I done it," and the father said that if he was ten years younger he would knock all the bones in the doctor's body crooked, and the doctor said, "I don't blame you," and then asked the prosecutrix, "Did I hurt you," to which she answered, "No, sir, but you used me, that is what you done." The defendant's version of this transaction was that he saw the prosecutrix and her father coming up the stairs and went and met them at the head of the stairs and the father yelled the question, "Are you a man or a beast?" and he said, "Be quiet, you don't need to make such a row here," and the father was yelling and he took them into Dr. Steve's office and asked, "Why all this fuss, you don't need to make such a row," and the father said, "I would break every bone in your body if I were a young man," and he said, "No, I don't believe you would. I have apologized to this girl and am sorry I done anything to her and I don't know what more I can do;" that he thought the girl had told her parents what actually happened in the office and had no idea she had told them that he had intercourse with her, that he did not cry, and that when they started away he said to the girl, "I didn't hurt you, did I?" and she just stared.

Two local physicians examined the private parts of the prosecutrix on Sunday afternoon. They found a relaxed vagina, no rupture of the hymen, no lacerations, inflamma-

tions, or even redness; they found a whitish secretion which was not microscopically examined, and might have been either a discharge of leucorrhea or semen. Both doctors thought that the condition of the vagina indicated the recent entrance of some foreign body, and both were of opinion from the insertion of the finger that there might have been intercourse with a man of normal private parts without rupture of the hymen.

Drs. Lyman and Becker were called as expert witnesses by the defense. They testified to an examination of the private parts of the prosecutrix at the time of the trial in May, 1917. They found an unbroken hymen, with round opening sufficient in size for the introduction of one finger, but not large enough for two fingers without considerable pain. They also found a mucoid discharge quite similar to that found by the two physicians on the day of the alleged crime, and they testified that in their opinion it would be impossible for a man of ordinary private parts to have sexual intercourse with her without breaking the hymen. Dr. Heising, a practicing physician of Menomonie, testified that the defendant came to his office at about 2 o'clock p. m. on the day of the alleged crime and told him he was in trouble with the M—— family; that he forgot himself, and while he was treating the girl on her face he made love to her, and embraced and hugged her, and feeling that his passions might get the best of him he stopped; that she was on the table and he was on top of her, but that he did not have intercourse with her.

A number of witnesses testified that the defendant's reputation for chastity and morality was bad in the community before the alleged crime, while an equal number testified that it was good.

Upon overruling a motion for a new trial the trial judge filed a written opinion in which he says, among other things:

"The gravest question in this case is whether the evidence supports the verdict. I would have been better satisfied with

the result had the jury returned a verdict of guilty upon the second count, to wit, adultery, rather than the verdict which has been returned. During the trial, before submitting the case to the jury, I had considerable doubt as to whether I ought to submit to the jury the question of defendant's guilt of rape. I now have some doubt as to whether the verdict of rape returned by the jury should be sustained.

"The doubt arises upon the question whether the evidence reasonably tends to show that the prosecutrix made such resistance to sexual intercourse as to make the act of intercourse, if accomplished, accomplished by force and against her will, within the meaning of the statute as interpreted by our supreme court decisions."

The trial judge then discusses the two cases of *Brown v. State,* 127 Wis. 193, 106 N. W. 536, and *McLain v. State,* 159 Wis. 204, 149 N. W. 771, and concludes that by the decision in the last named case this court has receded from the extreme doctrine of the *Brown Case.* He adverts also to the amendment of sec. 4381 of the Statutes in 1915, reducing the minimum punishment for rape from ten years to one year, and concludes that this means that the legislature had in mind that under the ruling in the *McLain Case* offenses might now constitute rape which would not be rape under the *Brown Case,* and after adverting to the deference owing to the verdict of the jury says:

"In view of these considerations and the importance which this case has in the vicinity where its result will be known, I think that if this verdict should be set aside the responsibility therefor should be shared by the supreme court. If I were to set this verdict aside and grant a new trial I would not, upon another trial, submit to the jury the count charging rape, but would submit only the adultery count. I think that all evidence existing has been presented, and if it does not now sustain this verdict it would not sustain a conviction in another trial. An order for new trial would therefore rest finally upon my own judgment and responsibility and would determine, against the opinion of the jury, that the evidence does not fairly and reasonably sustain the charge of rape.

"I think the judgment of the supreme court should be passed upon this and that they should share the responsibility if such an order is to be entered. . . .

"In accordance with the ruling in the *McLain Case* I think I ought to let this verdict stand.

"I am anxious, however, that before the defendant be imprisoned after sentence, the supreme court have opportunity to pass upon this case, and if I become satisfied that I have the authority, I will, after sentence, stay execution for a period to permit the securing of a writ of error and the settlement of a bill of exceptions, so that the case may be transferred to the supreme court for review, and the judgment be reviewed by the supreme court before any imprisonment occurs.    I will assist in all reasonable ways within my power to accomplish this."

For the plaintiff in error there was a brief by *Wm. H. Timlin, Jr.,* and *P. W. Dean* of Milwaukee, attorneys, and a supplemental brief by *P. H. Martin* of Green Bay, of counsel, and oral argument by *Mr. Martin, Mr. Timlin,* and by *Mr. W. J. Kershaw* of Milwaukee.

For the defendant in error there was a brief by the *Attorney General, J. F. Baker,* assistant attorney general, and *H. W. Rudow* of Menomonie, district attorney, and oral argument by *Mr. Baker* and *Mr. Rudow.*

Winslow, C. J.    It appears very clearly from the opinion filed by the trial judge that much doubt existed in his mind as to whether the verdict was sustained by the evidence.    He thought that there was a wide divergence between the doctrine of the *Brown Case* (127 Wis. 193, 106 N. W. 536) and the doctrine of the *McLain Case* (159 Wis. 204, 149 N. W. 771), and that the verdict was wrong if the first named case was to be followed, but could be sustained if the other case was the standard.    In this dilemma he concluded to overrule the motion on the strength of the *McLain Case* and recommended and encouraged the transfer of the case to this court in order that the question might be authoritatively decided.

before the sentence was carried into execution. We take it that this is what the trial judge meant when he said that if the verdict is to be set aside the responsibility therefor should be shared by this court. In the strict and accurate sense no one can share the responsibility of the trial judge on a motion for a new trial. The defendant has the right to have "the solemn opinion of the judge who tried the cause, after a careful hearing of all that may be alleged against its justice, that it [the verdict] ought to stand." *Ohms v. State,* 49 Wis. 415, 5 N. W. 827; *Lonergan v. State,* 111 Wis. 453, 87 N. W. 455. The conscience of the trial judge must be satisfied with the verdict. In each case it is an individual problem presented to but one conscience, for every conscience must meet its individual problems alone. While we do not consider there is so great a divergence between the two cases named as the trial judge thought, it may be readily admitted that there is some ground for his difficulty. The abstract principle held in each case is the same, to wit, that in order to constitute the crime of rape there must be not only lack of consent, but the utmost resistance by all means within the woman's power.

It cannot be denied, however, that there is a considerable difference between the tone of the two opinions and the impression which they leave upon the mind, and this was recognized when the later opinion was written. The impression left by the *Brown Case* unquestionably is that, unless the woman is beaten into unconsciousness or put into a state of mortal fear by threats, she must make resistance approaching the superhuman in its ferocity and effectiveness before the crime of rape can be committed. In the *McLain Case* there was an endeavor to make it clear that while the utmost resistance was required in all cases, this requirement was relative, not positive, and that what constitutes the utmost resistance in a particular case must depend largely upon the facts of that case, such as the temperament of the victim, the relations of the parties, her state of health, her physical strength,

her age, her experience, her courage, her nervous condition at the time, and perhaps other circumstances naturally affecting her powers of resistance.    So reading the *McLain Case,* we do not think it can be said that there is any direct conflict between its doctrine and the doctrine of the *Brown Case,* but simply that it supplements the *Brown Case* and removes the erroneous idea which is likely to be gathered therefrom, namely, that the measure of resistance required is absolute and fixed in all cases and must be so great that, while it fails to defeat the purpose of the ravisher, the failure is only by the narrowest possible margin.

Applying these principles to the testimony in the present case, we are obliged to say, after a diligent examination of the evidence, that in our judgment the crime of rape is not proven, on account of the grave doubt that remains as to whether the prosecutrix made that resistance which the law requires in view of all the surrounding circumstances.    Justices SIEBECKER and ESCHWEILER are of opinion that the question whether intercourse was had at all is so gravely in doubt that the judgment should be reversed on that ground also, but the court does not so hold.

We shall not rehearse the evidence in this opinion; it has been quite fully stated in the statement of the case.    It must be sufficient to say here that it is lacking in so many of the elements which almost invariably attend this detestable crime that there must always remain a very robust doubt as to the fact of guilt.

The prosecutrix was apparently a normal girl of average health and strength, over seventeen years of age.    She was not deceived by false pretenses that she was being treated medically nor made afraid by threats of violence; she was suddenly assaulted (according to her own story) in a way that could not be misunderstood; she made no outcry, though the place of assault overlooked a much frequented public street, and this was not from inability to speak, for she says

that she said to defendant while he was on her, "You hurt me;" she claims to have fought, but there was absolutely no evidence of any struggle left on either party or on their clothing; there were no stains or marks on clothing or person; the hymen was unruptured; there was not the slightest mark of violence on her legs nor private parts, nor was there any redness or inflammation visible anywhere; she admits that within an hour afterwards she said that the defendant did not hurt her; according to the testimony of two disinterested experts, who examined her about eight months later, the hymen was then normal and absolutely intact and the opening was such that it would have been impossible for forcible intercourse to have taken place by a man with normal parts without rupturing it; the violent struggle which she claims took place was on a physician's table twenty-two inches wide, mounted on rollers on a smooth floor.

There are other facts in evidence which might be enlarged upon tending to throw the gravest doubt upon the story of the prosecutrix as to her resistance, but it is not deemed necessary to enlarge upon them here.

A number of detail errors are alleged, but the case was tried with extreme fairness and care on the part of the trial judge, and we find no rulings that can be considered prejudicially erroneous or that require treatment.

*By the Court.*—Judgment reversed, and a new trial ordered.