HINTZ, by Guardian *ad litem,* and another, Appellants, v. MIELKE and another, Respondents.*

*November 29—December 29, 1961.*

———

* Motion for rehearing denied, with $25 costs, on April 3, 1962.

For the appellants there were briefs and oral argument by *John William Calhoun* of Fond du Lac.

For the respondents there was a brief and oral argument by *John P. McGalloway, Sr.,* and *William D. McGalloway,* both of Fond du Lac.

MARTIN, C. J. The accident occurred on January 30, 1958, at an uncontrolled intersection in the city of North Fond du Lac. Michigan street runs north and south; Cleveland street runs east and west. Painted crosswalks extend across Michigan street between the southeast and the southwest corners and between the northeast and northwest corners. Washington school is located one block north of the intersection on Michigan street. About 500 feet north of the intersection, on the east side of Michigan, is a sign denoting a school zone. The speed limit on Michigan is 25 miles per hour. At the time of the accident the streets were icy and the weather was cold.

At about 3 p. m. on the day in question David Hintz, then five years old, was returning to his home from Washington school. He approached the intersection at the northeast corner, intending to walk west across Michigan.

Defendant Mielke was traveling north on Michigan toward his home which was located across from the school. He approached the intersection at a speed between 15 and

20 miles per hour. He testified that as he entered the intersection he saw David step off the curb at the northeast corner into the path of his car; he blew his horn, applied his brakes, and slid to a stop with the rear wheels of the car in the crosswalk; the boy was on the left side of the car, lying or sitting on the pavement within the crosswalk.

Mielke further testified that David got to his feet and crossed the street. He spoke to the boy and offered him a ride home, which David refused. He found out where the boy lived and went there to tell his parents what happened. The Hintz home is about three blocks from the place of the accident. David arrived shortly after Mielke got there. Mrs. Hintz asked David what happened and he said he had fallen down and was not hit by Mielke's car. Mielke testified he thought he had hit, or at least brushed, David with his car.

Plaintiffs' complaint alleged negligence on the part of Mielke, causing injuries to David Hintz which resulted in a permanent brain disorder.

The first issue submitted to the jury was as to Mielke's negligence with respect to lookout, speed, management and control, and yielding the right of way. The jury found no negligence in any of these respects and the trial court held that its findings were supported by the evidence.

Mielke and David were the only witnesses to the accident. David testified he could not recall anything about it. According to Mielke's testimony, he was watching for pedestrians as he approached the intersection, but he did not see David until he stepped off the curb into the path of his car which was then entering the intersection. The evidence showed there were trees along Michigan street and a telephone pole on the northeast corner above the crosswalk. From this the jury could reasonably have inferred that the boy was hidden from Mielke's sight until he stepped from the curb.

As to Mielke's speed, plaintiffs call attention to the fact that he testified on adverse examination that he was traveling 15 to 20 miles per hour when he entered the intersection and that he was 15 to 20 feet from the south crosswalk when he first saw the boy; that on the trial he revised the estimate of his speed to 15 miles per hour and testified he did not see David until he entered the intersection, at which point David was leaving the curb. Considering the icy condition of the pavement, the fact that Mielke's car came to a stop with its rear wheels within the crosswalk corroborates his testimony that he was traveling at a slow speed, and the jury could reasonably have concluded that he was not negligent in that respect.

Plaintiffs contend Mielke was negligent as to management and control because he did not turn his wheels to the left or right when he saw the boy come into his path. Mielke testified that he blew his horn, braked, and slid to a stop in a very short distance. Again considering the condition of the pavement, the jury could well have believed that Mielke did all he could do to avoid the boy in the time and distance he had after David stepped from the curb. In this connection, plaintiffs argue that the trial court erred in giving the following instruction on skidding, based on Wis J I—Civil, Part I, 1280:

"You are instructed that skidding of a motor vehicle may occur without fault and, when it does occur, it may likewise continue without fault for a considerable period of time. It results in partial or complete loss of control of the motor vehicle under circumstances not necessarily implying negligence. Having lost control of the motor vehicle through skidding, the driver is not responsible for what happened thereafter, unless he was guilty of negligence which contributed to the loss of control.

"Where the icy or slippery condition of a road increases the danger of travel, and the driver is, or ought to be, aware

of such condition, then he is required to exercise a degree of care commensurate with such circumstances.

"A driver of a motor vehicle cannot shield himself against a charge of negligence merely by showing that the motor vehicle operated by him was temporarily beyond his control due to skidding if the skidding was the result of his negligence."

It is contended by plaintiffs that the instruction should have included the following:

"In answer to this question, you may consider the speed of the defendant's motor vehicle prior to or at the time of skidding or the manner in which he controlled his car even after the skidding had been commenced, in determining whether the defendant was negligent."

This paragraph is contained in Wis J I—Civil, but as an alternative. The instruction given by the court informed the jury that if defendant Mielke's negligence resulted in a skid, he was responsible for the consequences even though his car was uncontrollable. Plaintiffs contend he was negligent after the skid began because he failed to turn his wheels, and thus the alternative instruction should have been given. It is to be noted, however, that plaintiffs failed to request this particular instruction. They cannot participate in preparing instructions and then be permitted to complain. In any event, we cannot say that the facts warranted the instruction contended for. From the evidence in the record, Mielke had little time to act and if he had attempted to turn to the right or left, it is unlikely his car would have changed direction, considering the icy condition of the street. It would be speculation to say that if he had turned his wheels he would have avoided the accident.

A pedestrian crossing within a crosswalk at an uncontrolled intersection has the right of way. But he does not have the right of way if he suddenly steps from the curb

into the path of a vehicle which is so close that it is difficult for the driver to yield. Sec. 346.24 (2), Stats. From the only evidence in the record as to David's actions, the jury could have concluded that this is what happened. It was therefore justified in finding Mielke not negligent as to yielding the right of way.

The burden was upon the plaintiffs to convince the jury by a preponderance of the evidence that Mielke was negligent. It may be observed that all the material testimony bearing on that question came from Mielke himself. His credibility was for the jury. We agree with the trial court that all the questions with respect to Mielke's negligence were questions of fact for the jury and that the findings are supported by the evidence and the inferences properly to be drawn therefrom. The court could not say, as a matter of law, that any of the questions should have been answered "Yes."

Plaintiffs contend that the findings as to no damages were contrary to the evidence and show passion, prejudice, and perversity on the part of the jury. It was conceded that David has a brain disorder, an atrophy of the cerebellum. The testimony established that his symptoms include atrophy of the foot and lack of co-ordination in the lower limbs. His parents testified that after the accident the boy ran temperatures, had nightmares, and was restless and upset.

The issue before the court and jury was the cause of David's brain disorder. Plaintiffs maintained it was the result of injuries he received in the accident. Defendants contended the boy suffered from the disorder prior to the accident.

David walked home from the place of the accident, a distance of about three blocks. In Mielke's presence Mrs. Hintz asked the boy if he had been hit and he answered, "No, I fell down." The boy was then undressed and examined. Mielke saw no scratches or bruises. The parents tes-

tified they observed a few small scratches on his neck and back to which the mother applied first-aid cream. Dr. Keenan, their family physician, sent the boy to a hospital for a checkup where Keenan, a pediatrician, an eye, ear, and nose doctor, and an orthopedic surgeon all examined him. The findings, according to Dr. Keenan's testimony, were essentially negative.

Dr. Keenan testified that in his opinion David's complaints of headache, neck pain, and pain in the right foot could have been a result of the accident.

Dr. Flanagan, an ear, nose, and throat specialist, examined David on February 27, 1958, and found a "slight swelling" over a ridge of bone on the right cheek, the so-called zygomatic arch, and could feel a "little tiny dent" in that area. He found evidence of in-co-ordination, lethargy, a tendency to fall. These findings indicated a disturbance to the central nervous system. It was his opinion that the dent in the zygomatic arch was caused by the accident and that there was a "reasonable possibility" that the accident caused the symptoms described above.

Dr. Henry Suckle, a neurosurgeon, examined David on February 1, 1960, and again in January of 1961. He testified that in his opinion David suffered from atrophy of the cerebellum and that the accident was the causal factor in producing that condition. On cross-examination he testified that if David had manifested a lack of co-ordination in his leg before the accident happened, his opinion would be different.

David's kindergarten teacher on January 30, 1958, testified that the boy's co-ordination, as shown by his classroom activities, had been poor prior to the date of the accident.

Dr. R. H. Quade, a neurological surgeon, examined David on May 2, 1960, having available to him X rays taken of the boy five months after the accident. He found the boy's weight and height to be considerably less than average, his

right foot smaller than the left. He noted that David had difficulty in recognizing the forms of objects and lacked co-ordination. These were findings of atrophy about the cerebellum and the cerebrum and it was his opinion that:

". . . without a clear history of any loss of consciousness at the time of the accident, would indicate to this examiner that such atrophy was of long standing, and pre-existed the accident. We find no clear-cut evidence to indicate any permanent aggravation of this pre-existing condition, by the accident."

Dr. Quade further testified that he was of the opinion that the accident could not possibly have caused the changes in the brain in a five-month period. David's weight and height indicated to him that the brain disorder was long in developing and had pre-existed the accident, but that the symptoms of such disorder would not be noticeable until he grew out of the toddler stage and reached the age of six or seven years. It was also his opinion that such a pre-existing condition would be aggravated only by an extremely severe injury because the part of the brain involved is well protected. He classified David as a child having a minimal degree of cerebral palsy "due to general causes, systemic causes, developmental causes" and that he found no competent medical evidence to indicate that any injury sustained in the accident either caused or permanently aggravated that condition.

It was for the jury to resolve any conflict in the medical testimony, and there is credible evidence to support the finding that David suffered no damages as a result of the accident. There is no merit in plaintiffs' argument that such findings show prejudice and perversity on the part of the jury. Nothing in the record indicates that it was prejudiced or failed to follow the trial court's instructions. On the contrary, the evidence almost compels the findings of the jury.

Plaintiffs contend that their medical witnesses should have been permitted to base their opinions on terms such as "I feel" or "I believe." This court has stated that the conclusion of an expert medical witness should amount to an assertion of his professional opinion and that the terms "I feel" and "I believe" are sufficient. But an expert opinion expressed in terms of a mere possibility is insufficient to sustain a finding. *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393. The incidents complained of arose at least in part because of improperly phrased questions by plaintiffs' counsel. When the trial court requested that the opinions be based on a reasonable degree of medical certainty, the witnesses complied. No prejudice resulted.

Plaintiffs maintain it was error for the trial court to instruct that as a matter of law David could not be contributorily negligent. The instruction was based on sec. 328.44, Stats., enacted by the 1959 legislature, and this court has construed the statute as having only prospective application. *Bair v. Staats* (1960), 10 Wis. (2d) 70, 102 N. W. (2d) 267. While the instruction was erroneous, we cannot see how it was prejudicial to the plaintiffs.

*By the Court.*—Judgment affirmed.