CASIMERE, Respondent, v. HERMAN and another, Appellants.

*September 8—October 8, 1965.*

For the appellants there was a brief by *Giffin, Simarski & Koch,* attorneys, and *James P. Brennan* of counsel, all of Milwaukee, and oral argument by *Mr. Brennan.*

For the respondent there was a brief and oral argument by *Theodore W. Harris* of Racine.

HEFFERNAN, J. The appellant argues that the testimony of Dr. McDonald, a psychologist, is not competent to support an award of future pain and suffering. He insists that the question of future pain and suffering is a medical one and

that, by statute, only a witness holding a medical degree and licensed under the law of the state of Wisconsin [1] is competent to testify. He relies also on previous pronouncements of this court in which we have said:

"Only a medical expert is qualified to express an opinion to a medical certainty, or based on medical probabilities (not mere possibilities), as to whether the pain will continue in the future, and, if so, for how long a period it will so continue. In the absence of such expert testimony . . . the jury should be instructed that no damages may be allowed for future pain and suffering." *Diemel v. Weirich* (1953), 264 Wis. 265, 268, 58 N. W. (2d) 651. [2]

The respondent distinguishes these cases by pointing out that they concern testimony of a nonexpert layman, as contrasted to the testimony of a licensed physician. The respondent claims that the rule is not applicable where an expert, in this case a clinical psychologist, is the witness. Respondent

---

[1] Sec. 147.14 (2) (a) and (b), Stats., reads as follows:

"(a) No person without a license or certificate of registration from the state board of medical examiners shall have the right to testify in a professional capacity on a subject relating to medical treatment, as a medical or osteopathic physician or practitioner of any other form or system of treating the sick, as defined in s. 147.01; provided that a medical or osteopathic physician, licensed to practice in another state, may testify as the attending or examining physician or surgeon to the care, treatment, examination or condition of sick or injured persons whom he has treated in the ordinary course of his professional practice for the sickness or injury which is the subject of the judicial inquiry in any action or proceeding in which he is called as a witness.

"(b) A court may permit any person to testify as an expert on a medical subject in any action or judicial proceeding where proof is offered satisfactory to the court that such person is qualified as such expert."

[2] See also *Peterson v. Western Casualty & Surety Co.* (1958), 5 Wis. (2d) 535, 93 N. W. (2d) 433; *Rude v. Algiers* (1960), 11 Wis. (2d) 471, 105 N. W. (2d) 825; *Lucas v. State Farm Mut. Automobile Ins. Co.* (1962), 17 Wis. (2d) 568, 117 N. W. (2d) 660; and *Spleas v. Milwaukee & Suburban Transport Corp.* (1963), 21 Wis. (2d) 635, 124 N. W. (2d) 593.

also relies on sec. 147.14 (2) (b), Stats., which permits "any person to testify as an expert on a medical subject in any action or judicial proceeding where proof is offered satisfactory to the court that such a person is qualified as such expert." In support of this, respondent points to the record showing that the witness had an extensive educational background in psychology, that he held a Ph.D. in the subject, and had practiced as a clinical psychologist for several years. Moreover, his qualifications to testify were not challenged by the appellant until after the rendition of the verdict.

Respondent also quotes our language in *Alsteen v. Gehl* (1963), 21 Wis. (2d) 349, 359, 124 N. W. (2d) 312:

> "Psychiatry and clinical psychology, while not exact sciences, can provide sufficiently reliable information relating to the extent of psychological stress, and to the causal relationship between the injury and the defendant's conduct, to enable a trier of fact to make intelligent evaluative judgments on a plaintiff's claim,"

and concludes that, though we comment conjunctively on the probative value of psychiatry and psychology when testifying, this is indicative of the acceptance of the testimony of a psychologist alone. Appellant, on the other hand, does not deny the competence of a psychologist to testify as an expert witness, but insists that his testimony as an expert (at least on medical matters), relating to the tests he conducted, are merely tools to be used by the licensed psychiatrist to make his findings more objective, but, of themselves and without the aid of the medical expert, are insufficient to support the award for future pain and suffering.

Suffice it to say that the arguments posed by the parties point up serious questions regarding the competence of a psychologist to testify as to future pain and suffering or in regard to other aspects of a personal-injury case having medical implications when that testimony is not used as an

adjunct to the testimony of a licensed physician or psychiatrist.

Nevertheless, qualification of an expert witness has historically not been a matter of licensure, but a matter of experience. During periods of epidemic, when lay persons were extensively exposed to disease, they were competent to testify in regard to particular diseases with which they were familiar.[3] In Wisconsin we have held, in view of his knowledge of the condition of dead bodies, that a nonmedical coroner could give his opinion of the time of death. *Palmer v. Schultz* (1909), 138 Wis. 455, 120 N. W. 348. This court has allowed the testimony of lay witnesses that an applicant for a life insurance policy was apparently in good health. *Stanislawski v. Metropolitan Life Ins. Co.* (1939), 231 Wis. 572, 286 N. W. 10.

In *State v. Law* (1912), 150 Wis. 313, 136 N. W. 803, 137 N. W. 457, three professors of the University of Wisconsin medical school, none of whom were licensed to practice in the state as physicians, as the statute required, were permitted to testify as expert medical witnesses that the abdominal cavity of a deceased abortion victim contained "bacteria known as streptococci" and that the deceased was five or six weeks pregnant at the time of death. The court stated at page 328:

"The mere fact that the science of medicine covers, includes, or requires some knowledge of bacteriology, or chemistry, or botany, or biology, or embryology would not exclude an expert in either of these sciences . . . ."

Hence, the law traditionally has permitted limited testimony of a medical nature by one not licensed as a medical doctor, if he is, in fact, qualified as an expert. Moreover, even a cursory study of the literature of mental conditions reveals that there are those who question whether all aspects

---

[3] *Evans v. People* (1863), 12 Mich. 27, 36, 20 N. W. 531.

of abnormal behavior are, in fact, medical problems in the traditional sense.

"Behavior considered to be mental illness is believed to result primarily from the unconscious or uncontrollable disruption of thought-process integration and symbol interpretation, resulting from adaptive processes learned or experienced in coping with the self-concept or environment. The apparently psychological-functional nature of these disturbances—*e.g.,* their attempt to protect the individual from personal stress, as well as the absence of defined symptom patterns or known causative organisms—raises a serious question as to the appropriateness of continuing to consider them diseases in the traditional medical sense." [4]

In Noyes and Kolb, Modern Clinical Psychiatry, it is stated:

"The physician must realize, however, that patients may become ill from disturbed human relations as well as from genetic, constitutional, metabolic or other physical causes. He should recognize that mental disorders are not so much diseases as disturbances of persons." [5]

Considering the recent origins of psychology and psychiatry, it is not surprising that there is a sharp difference of opinion in regard to where the expertise of the psychologist impinges on the exclusive domain of the psychiatrist.

It is therefore little wonder that the courts have been reluctant in allowing, and generally are adamant in refusing to allow, a psychologist to "go it alone" as a witness in what might be in the realm of medicine. [6]

---

[4] 50 American Bar Association Journal (1964), 240, George Lassen, The Psychologist as an Expert Witness in Assessing Mental Disease or Defect.

[5] Ibid. page 241.

[6] Generally, for opposing points of view re the competence of a psychologist as a "medical" witness, see briefs submitted by American Psychiatric Association and American Psychological Association in *Jenkins v. United States* (D. C. Cir. 1962), 307 Fed. (2d)

On the other hand, there are areas, such as psychometrics, where the skill of the psychologist is considered by many to be superior to that of the psychiatrist.

The law has long permitted calling as an expert witness any person whose training, experience, and method within his particular discipline is acknowledged to be sound and trustworthy. In many aspects of his work, the psychologist has undoubtedly met this standard.

As the great Wigmore said many years ago:

"Whenever the Psychologist is really ready for the Courts, the Courts are ready for him." 3 Wigmore, Evidence (3d ed.), p. 368, sec. 875.

However, to decide the case before us, we are not obliged to explore the penumbra of the psychologist's expertise where some members of this court have grave doubt as to such testimonial competence on the part of a clinical psychologist.

We so conclude because the testimony of Dr. McDonald, taken at its full value, irrespective of any questions that have been raised in respect to his testimonial qualifications as a witness, is insufficient to support the award of damage for future pain and suffering.

The only testimony in regard to future pain and suffering, or future disability, is that elicited from Dr. McDonald by the plaintiff's attorney. The sum total of that testimony appears below:

"*Q.* What prognosis did you reach with respect to Miss Casimere? *A.* That she was, first of all, the fact that she was in need of treatment for her emotional condition, and that if she did not get that treatment, the condition that I detected in her was likely to persist.

"*Q.* How long do you think it will persist without treatment? *A.* Very probably as long as treatment is not instituted.

"*Q.* For her lifetime if she doesn't get it? *A.* That is quite possible."

This testimony, even though it had been given by a concededly qualified witness, fails to meet the standard of medical certainty required by this court. This court has held that, though no particular words of art are necessary to express the degree of medical certainty required to sustain an award for future pain and suffering, it is necessary that a reasonable interpretation of the expert's words show more than a mere possibility or conjecture.

"The test is not the use of a word but the meaning or sense in which such word is used. To ascertain the meaning of words and phrases is a problem of interpretation." *Unruh v. Industrial Comm.* (1959), 8 Wis. (2d) 394, 402, 99 N. W. (2d) 182.

It is clear that the phrase used by Dr. McDonald that it was "quite possible" that the disability would persist for her lifetime does not meet the standard required. True, he did use the phrases, "likely to persist," and that it would "very probably" persist. However, the probative effect of this testimony is substantially impaired by Dr. McDonald's statements that are inconsistent therewith. He testified, "that *if* Miss Casimere were working,. her condition would improve." (Emphasis supplied.) He admitted that he had not seen the plaintiff except for a brief interval prior to trial and, as to that meeting, he stated, "I was not able to assess whether she suffers from emotional disturbance at the present time . . ."

More significantly, the testimony of Dr. McDonald is pregnant with the admission that the mental condition from

which the respondent suffers is reversible. He states that the disability will persist "as long as treatment is not instituted."

This statement can well lead to the conclusion that the condition, if treated, is curable. Under this state of the evidence, the jury could not find to the "reasonable degree of medical certainty or probability" [7] required that the injury would be permanent, and the extent of future disability or pain and suffering is merely speculative.

Moreover, the record is devoid of any attempt on the part of the respondent to mitigate damage by undergoing the treatment allegedly required to cure or ameliorate her mental problems. Dr. Groh, the orthopedic surgeon who treated the respondent for her physical injuries, testified that the respondent admitted she did not take the prescribed course of exercises designed to alleviate back pains which allegedly became acute after the accident, but which Dr. Groh concluded were postural in origin.

We have previously said:

"No injured person is required to undergo surgery or treatment that is hazardous or unduly expensive but one injured by the wrong of another is obliged to exercise reasonable care to minimize damages. This obligation includes the seeking of medical care as well as the following of the advice of the physician consulted in order to alleviate the injury." *Collova v. Mutual Service Casualty Ins. Co.* (1959), 8 Wis. (2d) 535, 539, 99 N. W. (2d) 740.

The appellant cannot be expected to pay for a lifetime's disability or pain if proper medical treatment or psychotherapy can reasonably correct the respondent's ailments. Yet no evidence is of record of the probable duration of treatment

---

[7] *Diemel v. Weirich* (1953), 264 Wis. 265, 58 N. W. (2d) 651; *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 86, 102 N. W. (2d) 393; *Bleyer v. Gross* (1963), 19 Wis. (2d) 305, 120 N. W. (2d) 156.

or its cost. While the injured party is not obliged to submit to medical or surgical care,[8] the proper period of time for which damages for future pain and suffering or other disability are awarded cannot be in excess of that reasonably required to effect a cure.

Thus, the record leads to the inference that the respondent's disability is not permanent but correctable. In addition, no evidence was presented to the jury by which it could have calculated the reasonable damages that would arise in the future. We are obliged to hold that the evidence is not sufficient to sustain an award of any damages for future pain and suffering or for permanent or future disability.

The jury also awarded $2,500 for loss of earnings. The evidence does not support that portion of the verdict in that amount. It is conceded by appellant that if the respondent was unable to work from February to May, 1964, her loss of wages for that period would properly amount to $1,401. Her inability to work for that period has been adequately proved. It also appears that the respondent lost time from work from July 17, 1964, to the time of trial and is, hence, entitled to $525, or a total loss of earnings to the time of trial of $1,926. We find no evidence that would sustain a wage loss in excess of that amount. Presumably, the jury awarded the balance of the $2,500, or $574, for future loss of earnings. There is no evidence to support such an award. It is excessive.

We find the jury's award of medical expenses to date $600, property damage $50, loss of earnings $1,926, and the award for past pain and suffering $2,000 to be supported by the evidence; and to the extent of $4,576, the verdict (prior to application of comparative negligence ratio) is sustained. The jury's award for future pain and suffering or future loss of earnings is speculative at best and must be set aside. We,

[8] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 87, 102 N. W. (2d) 393.

however, give the respondent the option to accept the judgment as reduced or to elect to have a new trial on all issues.

*By the Court.*—Judgment reversed, and cause remanded to the trial court with instructions to enter a formal order for a new trial on all the issues, unless within twenty days after the return of the record from this court to the trial court the respondent files a consent with the clerk of the county court to accept judgment in the sum of $4,118.40 (which figure is the jury's verdict as supported by the evidence as reduced by 10 percent negligence, in accordance with sec. 331.045, Stats.), plus costs and disbursements. If the appropriate notice of his election to accept the reduced amount is given by the respondent within the time specified, then in lieu of the order for a new trial, the county court should enter a judgment for such reduced amount.