STATE, Respondent, v. MUHAMMAD, Appellant.

*No. State 37. Argued November 1, 1968.—Decided December 3, 1968.*

(Also reported in 162 N. W. 2d 567.)

For the appellant there was a brief and oral argument by *L. William Staudenmaier* of Milwaukee.

For the respondent the cause was argued by *Harold B. Jackson, Jr.*, assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *David J. Cannon,* district attorney.

WILKIE, J. Defendant frontally attacks his conviction as being founded on a jury verdict supported by insufficient evidence.

". . . On an appeal in a criminal case the test of the sufficiency of the evidence for a conviction is 'whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt.' " [1]

---

[1] *State v. Stevens* (1965), 26 Wis. 2d 451, 463, 132 N. W. 2d 502; and cases cited therein.

The facts as detailed in the testimony of the complaining witness, a twenty-two-year-old single woman, are as follows:

On the evening of Sunday, October 8, 1967, she had gone alone to the Attic, a tavern and nightclub in downtown Milwaukee. While there she saw the defendant who asked her, at about one a. m., if he could come up to her apartment. She said that he could. Just before she left the Attic, she again talked to the defendant. She asked him if he still planned to come to her apartment. He said that he did, but wanted to talk to a few friends and would be over later. The complainant then left with some of her friends at about 1:45 a. m., and arrived at her apartment about two a. m. The defendant arrived at the apartment about thirty minutes later and was let in by the complainant. No one else was present during the time that the defendant and the complaining witness were together in the apartment.

According to the complainant, the defendant prepared and smoked two marijuana cigarettes in her presence. She testified "I had one drag off of it." She admitted that she had smoked marijuana on previous occasions. She further testified that defendant finished smoking the marijuana cigarettes at about 3:30 a. m. and that between that time and six a. m. he and she just sat on the floor and talked with one another. According to complainant, her difficulties began at about six a. m. when the defendant attempted to kiss her—she backed away, but he tried to kiss her again while they were still on the floor so she moved to the couch which was on the other side of the room. She testified that the defendant followed her to the couch and tried again to kiss her. She continued to refuse at which point the defendant pushed her down on the couch and "pounced" on top of her. He then started kissing her and unbuttoning her jacket and blouse. After he succeeded in unbuttoning

the jacket and part of the blouse he picked her up and started carrying her to the bedroom.

Complainant testified that while they were going through a small hallway on the way to the bedroom, she attempted to kick the defendant, but could not because of the narrowness of the hallway. She claimed that when they arrived in the bedroom the defendant pinned her down on the bed and unbuttoned the rest of her blouse and unsnapped her bra. The bra had been broken before and the elastic was temporarily fastened together with a bent safety pin. She then got off the bed but the defendant came up behind her and put his hand over her mouth and nose so that she couldn't breathe. She stated:

"I finally got his hand away from my face, and I got up and started walking away from him. I thought I'd walk to the other side of the bedroom and into the other room, but he was blocking the door, and he came up from behind me and put his arm around my neck with his inner part of the elbow, right here, (indicating) and started pulling my head back and started choking me and started to remove the rest of my clothes."

She claimed that he removed her slacks and panty-hose after which he pushed her back on the bed; she tried to push him away but he kept choking her. She testified that at this point defendant picked up an empty brandy bottle from the complainant's nightstand and threatened to strike her with it. She testified:

"I was scared. I was afraid he was going to hit me, and I started struggling with him again and in the process of this he started taking off some of his clothes. I don't know how he got them all off, but he did, and eventually he got down to where he had only his undershorts on, and those he took off approximately down to his knees or so, and then he started having sexual intercourse with me."

Thus both parties were naked during the act.

The complainant testified that during the attack she cried and yelled at the defendant, but did not scream. She also testified that she did not bite the defendant and

that she did not know whether she scratched him. She testified:

"I yelled at him. I told him to stop. If that's considered screaming, then I screamed, but as far as screaming out loud like someone would do when you are terrified, I didn't come out to that point, but I yelled at him loud enough that could be interpreted as screaming. It depends on what you interpret as screaming, and I interpreted it as screaming."

The entire act, from the first kiss attempt to the completion of sexual intercourse, occurred between the hours of six and seven a. m., and lasted about forty-five minutes.

She testified that after the act was completed, the defendant stayed at the complainant's apartment for another hour and forty-five minutes. She claimed that after they were dressed they went into the living room and sat down on the couch at which time the defendant started to explain why he had done what he did. He said that he had done wrong and asked her to phone the police. When she dialed the phone to call the police she claims he took the phone from her and slammed the receiver down. She testified that he still wanted to talk to her at that time and asked her to promise not to tell her boyfriend or the police. She claims that he left at about 8:50 a. m.

The complaining witness also testified that she was not of previous chaste character, and was unable to state how many different males (although admitting to "very few") she had had intercourse with prior to October 9, 1967. Also, according to Dr. Crosby, her regular doctor, she was taking birth-control pills for acne.

Defendant took the stand in his own defense and testified in detail as to his version of the events of the early morning in question. He said he had met complainant at the Attic and that she had invited him to

her apartment to smoke some marijuana. He testified to preparing three marijuana cigarettes with marijuana furnished by the complainant. He stated that at about 3:45 a. m. he started to make love to complainant. He described in detail his account of the activities which led up to the act of intercourse, including certain erotic and unnatural acts performed and requested by the complainant. He testified that after having relations with her, he had pushed her off the bed, spit in her face three times, called her a number of names, and threatened to tell her boyfriend and others about the preceding events. He testified that he had left her apartment between 4:30 and 4:45 a. m. He further testified that complainant's entire attitude up to and including the time the parties engaged in intercourse had been one of complete cooperation with him. Thus, the act of intercourse is admitted. The only issue at the trial was and is whether the admitted intercourse between the defendant and complaining witness was or was not forcible and against her will.

Sec. 944.01 (2), Stats., provides:

"In this section the phrase 'by force and against her will' means either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

Many cases have construed the "utmost resistance" requirement of the above statute. In several recent cases [2] this court has reemphasized that the term "utmost resistance" is relative, not absolute. This standard was spelled out in *McLain v. State.*[3]

---

[2] *See e. g., State v. Schmear* (1965), 28 Wis. 2d 126, 135 N. W. 2d 842; *State v. Waters* (1965), 28 Wis. 2d 148, 135 N. W. 2d 768; *Gray v. State* (1968), 40 Wis. 2d 379, 161 N. W. 2d 892.

[3] (1914), 159 Wis. 204, 206, 149 N. W. 771.

". . . the term 'utmost resistance' is a relative rather than a positive term. What would be 'utmost resistance' on the part of a weak and nervous person, with a temperament easily frightened, might be the veriest sham on the part of a robust person in good health, whose nerves and courage are normal."

A further clarification of this principle is found in *B— v. State,*[4] wherein this court stated that:

". . . In the *McLain Case* there was an endeavor to make it clear that while the utmost resistance was required in all cases, this requirement was relative, not positive, and that what constitutes the utmost resistance in a particular case must depend largely upon the facts of that case, *such as the temperament of the victim, the relations of the parties, her state of health, her physical strength, her age, her experience, her courage, her nervous condition at the time, and perhaps other circumstances naturally affecting her powers of resistance.* So reading the *McLain Case,* we do not think it can be said that there is any direct conflict between its doctrine and the doctrine of the *Brown Case,* but simply that it supplements the *Brown Case* and removes the erroneous idea which is likely to be gathered therefrom, namely, that the measure of resistance required is absolute and fixed in all cases and must be so great that, while it fails to defeat the purpose of the ravisher, the failure is only by the narrowest possible margin." (Emphasis added.) [5]

Thus it appears that "utmost resistance" is measured by a subjective test of what resistance an individual victim is capable of exerting. In *State v. Schmear* [6] we stated that "While the law requires the utmost resistance as evidence of the woman's will, the law does not require the useless or the impossible." [7] And in *State v. Waters,*[8]

---

[4] (1918), 166 Wis. 525, 166 N. W. 32.

[5] *Id.* at pages 533, 534.

[6] *Supra,* footnote 2.

[7] *Id.* at page 130.

[8] *Supra,* footnote 2.

we stated that "The strict physical-resistance requirement is relaxed somewhat if it would be useless to resist." [9]

In applying these well-established standards to assess complainant's resistance in the instant case, we must first observe that we must reject defendant's own testimony, as the jury was privileged to do, and examine complainant's own testimony to see whether it is sufficient to show the proper degree of resistance.

Considering the various elements relevant to the question as specified in *B— v. State*,[10] it first appears that as to complainant's health and physical strength there is nothing in the record to indicate that she was anything but normal.

Furthermore, complainant was a woman of considerable experience. By her own testimony she was not a virgin at the time of the alleged rape, and in fact she was unable to say how many different males she had had sexual intercourse with prior to October 9, 1967. "The law recognizes that a woman of previous unchaste character is more likely to consent to an act of sexual intercourse than is a woman who is strictly virtuous." [11] Her unchaste character, the fact that she went on her own to the Attic that evening, and the fact that she permitted the defendant to come to her apartment at 2:30 a. m. and smoke marijuana, are all factors bearing on the "temperament of the victim," and "her experience" factors listed in *B— v. State*. She certainly was not "mild, timid, socially inexperienced" as was the victim in *State v. Hoffman.*[12]

The record does not establish that the complaining witness was lacking in courage. Not only was she courageous enough to invite the defendant to her apartment at such an hour, but she claims to have kicked, struggled,

---

[9] *Id.* at page 155, and cases cited therein.

[10] *Supra,* footnote 4.

[11] *Kaczmarzyk v. State* (1938), 228 Wis. 247, 249, 280 N. W. 362.

[12] (1938), 228 Wis. 235, 245, 280 N. W. 357.

and yelled, and to have told defendant to leave her alone. Thus it appears that although she claims to have been threatened and choked there is no indication that she was so intimidated that she was afraid or unable to resist.

The evidence does not show that complainant was hysterical or in a highly emotional state during and following the alleged attack. Although she testified that she was crying and was afraid, her testimony also indicates that she was reasonably well aware of most everything that was going on around her. She was able to testify with some degree of certainty as to the time of day when each stage of the attack took place. She stated that defendant began making advances about six a. m., that the act was completed sometime around seven, that she attempted to call police at eight, and that defendant left the apartment at 8:50 a. m. She was able to remember the precise language that the defendant allegedly spoke during the attack, and she was able to give a detailed account of the moments just preceding penetration—she stated that one side of his body was pinning her down on her left side and that he "eventually took his left knee and put it between my two legs trying to spread my legs apart, and he was putting his hand under me . . . ." Yet she was "fuzzy" as to how defendant was able to hold her down, against her struggles, and at the same time completely undress himself, including his socks.

In *State v. Hoffman,*[13] this court, describing the type of fear rendering one incapable of resistance, stated:

"It therefore clearly appears that 'the fear' which renders the utmost resistance unnecessary is a 'fear of death or great bodily harm,' a 'fear of great personal injury,' or 'serious personal injury,' a fear that 'so overpowers her that she dares not resist,' a 'fear and terror so extreme as to preclude resistance,' a fear which

[13] *Id.* at page 240. *See also Loescher v. State* (1910), 142 Wis. 260, 263, 125 N. W. 459; *Bohlmann v. State* (1898), 98 Wis. 617, 620, 74 N. W. 343.

renders her mind 'well nigh incapable of continuing her resistance to repel him.' The fear therefore must not only be real but so great as to terrify her and render her practically incapable of resistance."

Applying this standard to the facts in the instant case, the situation here is similar to that in *Hoffman,* wherein the court stated:

". . . From the testimony of the complaining witness it appears that she was fully cognizant of everything that was going on, fully able to relate every detail thereof, and that she was in no reasonable sense dominated by that fear which excused the 'utmost resistance' within her power." [14]

In our opinion, certain parts of complainant's testimony are incredible. She stated that she was threatened with a brandy bottle (none was seen by any other witness, none was produced) ; the two sat on the floor and just talked for two and a half hours; no clothes were torn (other than the loosely clipped repaired bra), or buttons broken; and that she yelled and cried out (no screams or noises were heard by the residents of the two adjacent apartments, even though these residents were up and around and could have heard any such sounds, if uttered). Also her testimony regarding the bedroom struggle appears to contain some inconsistencies. For example she stated that:

"I finally got his hand away from my face, and I got up and started walking away from him. I thought I'd walk to the other side of the bedroom and into the other room, but he was blocking the door, and he came up from behind me and put his arm around my neck with his inner part of the elbow, right here, (indicating) and started pulling my head back and started choking me and started to remove the rest of my clothes."

It is difficult to understand how the defendant could be both in front and behind the complainant at the same time.

---

[14] *Supra,* footnote 12, at page 244.

We conclude, after a careful examination of the entire record, that the evidence is insufficient to sustain the conviction, that no jury could find the defendant guilty of this charge beyond a reasonable doubt.

Mention should be made of the testimony of Dr. Allen R. Crosby, who was complainant's physician before this incident and who examined her in the afternoon of October 9th. He stated that upon examining the complainant he found a tear, a little less than one-half inch, in the mucous membrane of the introitus. He explained that when a woman is sexually excited, she secretes a lubricant from various glands which makes intercourse easy. Intercourse without lubrication could result in pain and tear the mucous membrane. Thus, although this injury could be consistent with complainant's allegation of rape, at most it would only establish that penetration occurred before the complainant was sufficiently aroused. Thus, the injury does not point conclusively to rape.

Defendant raises a number of other questions involving possible errors in the conduct of the trial. In view of the fact that we have concluded that this case should be reversed because of insufficiency of evidence, it is unnecessary to consider these questions. However, we deem it advisable to consider two points urged by the defendant.

During the interrogation of Dr. Crosby, the following questions and answers appear in the record:

"*Q.* Doctor, the tear to the introitus that you found in . . . in your opinion would that be consistent with a history given to you by the patient that she was raped?

"*Mr. Staudenmaier:* I object to that as not proper in form and doesn't incorporate the records and test of certainty.

"*The Court:* Overruled.

"*The Witness:* Yes, sir, I would call that consistent with her charge of rape.

"*By Mr. Spindler:*

"*Q.* Now, Doctor, do you have an opinion to a reasonable medical certainty as to whether or not the usual

act of sexual intercourse would cause a tear to the introitus? *A.* Yes, sir.

"*Mr. Staudenmaier:* I object to that as invading the province of the jury.

"*The Court:* Overruled.

"*By Mr. Spindler:*

"*Q.* What is your opinion, Doctor? *A.* Well, you see, when a woman, a female, is sexually excited, she secretes a lubricant which comes from various glands. It's this secretion that makes intercourse easy and pleasurable. When a woman is not sexually excited, which of course is the case when you do vaginal examinations, it's a difficult thing to do, regardless of whether or not they have had children, so we find it necessary for doing all sorts of examinations to use a lubricant on the instrument and the hand as well. It's difficult without lubrication to even insert two fingers in the vagina. The male penis is approximately the size of three fingers. To force any instrument in without lubrication could easily result in pain and tear in the mucous membrane such as I mentioned before."

The first question was not couched in terms of the proper standard for opinion evidence. It would have been preferable to ask for an opinion couched in terms of a reasonable degree of medical certainty.[15] In view of our disposition of this case it is not necessary to decide whether permitting this inadequately phrased question was prejudicial.

We think defendant incorrect in his further claim that these two questions and their related answers were improper and prejudicial because the testimony directly invaded the province of the jury. Defendant relies on *Noonan v. State.*[16] In that case the state's medical wit-

[15] *Hintz v. Mielke* (1961), 15 Wis. 2d 258, 267, 112 N. W. 2d 720; *Hallum v. Omro* (1904), 122 Wis. 337, 344, 99 N. W. 1051; Mallare, *Wisconsin Civil Trial Evidence*, p. 133, sec. 4.46. *See also Casimere v. Herman* (1965), 28 Wis. 2d 437, 445, 137 N. W. 2d 73; *Unruh v. Industrial Comm.* (1959), 8 Wis. 2d 394, 402, 99 N. W. 2d 182.

[16] (1882), 55 Wis. 258, 12 N. W. 379.

ness was permitted to testify that upon examination of the prosecuting witness, he found her uterus, vagina, and other reproductive organs inflamed. He was then permitted to testify, over objection, that the inflammation, in his opinion, was "produced by her having connection—a violent, not a free connection." [17] This court reversed, stating:

". . . The question and the answer which it elicited were clearly incompetent. The witness was competent to state what effects might result from a rape, but it was going far beyond the range of authorized expert testimony to allow him to give an opinion that the inflammation he discovered was produced by rape. On his cross examination this witness was constrained to admit, what any person of ordinary intelligence knows without the aid of expert testimony that there are other adequate causes which might have produced such inflammation. It was for the jury to determine whether the inflammation which the witness testified to was the result of a rape, or of some other cause; and the extent to which expert testimony affecting that question could properly be resorted to, would be to show what effects upon the sexual organs of the female might result had she been ravished. But the testimony admitted was a usurpation of the province of the jury, and beyond all question its admission was error." [18]

However, as the state points out, the present case is distinguishable from *Noonan* in that the questions here asked by the state elicit only the opinion that the tear found on the complainant was consistent with her allegation of rape. The doctor did not say that the tear was caused by the rape. In answer to the state's second question, he appears to explain the physiological process involved in normal relations. The implication is that normal relations could not cause the tear, although he did not say this specifically.

*By the Court.*—Judgment reversed.

[17] *Id.* at page 260.
[18] *Id.* at pages 260, 261.

26

ROBERT W. HANSEN, J. (*concurring in part; dissenting in part*). Not so long ago, a Waukesha county court conviction on a charge of forcible rape was reversed by the circuit court on appeal. On the appeal to this court,[1] the state contended that the circuit court had ". . . improperly assumed a fact-finding function and improperly substituted its discretion for that of the trial court." This court found that the ". . . circuit court reviewed the record and concluded, *de novo,* that 'the facts are not as a matter of law sufficient to constitute the crime of rape,' " and that the circuit judge ". . . did not have the authority to review the record and come to an independent conclusion, . . ." The facts in the Waukesha case and legal issues raised differ, but the decision is relevant here because it spells out the limits of the scope of review as to sufficiency of evidence in criminal cases:

" 'This limitation upon the scope of review must rest, in part at least, upon a recognition that the trier of the fact who saw and heard the witnesses is in a better position to determine credibility and weight of evidence than a court which merely reads the transcript of the testimony.' "[2]

In the case before us, the jury found the defendant guilty. The trial court found that ". . . there is without any question certainly credible evidence to support and sustain the verdict . . ." He denied motions after verdict and imposed a substantial prison sentence. Thus, both jury and judge found credible the testimony of the prosecutrix that the act of intercourse was against her will.

The majority of this court is not impressed by the testimony of the prosecutrix. The majority opinion acknowledges her testimony that she "kicked, struggled and yelled," that she was "threatened and choked," that she

---

[1] *State v. Waters* (1965), 28 Wis. 2d 148, 135 N. W. 2d 768.

[2] *State v. Waters, id.* at page 152.

was "crying and afraid," but these statements are referred to only as "claims" although it would appear that the jury and trial judge accepted them as more than that.

As to the testimony of the prosecutrix, the majority opinion concluded: "In our opinion, certain parts of complainant's testimony are incredible." One example: "She stated that she was threatened with a brandy bottle (none was seen by any other witness, none was produced) . . . ." Since this was not a drama acted out before an audience, it is difficult to imagine who such corroborating witnesses might be. This court finds "incredible" testimony that both jury and trial judge found credible. This comes close to taking over the fact-finding function. I cannot join in finding the evidence insufficient to sustain conviction on the basis of its incredibility. The jury and trial judge who saw and heard the witnesses are in a better position to determine credibility and weight of evidence than the court which has merely read the transcript of the trial.

Appellant on this appeal sought in the alternative a reversal and dismissal or an exercise of the discretionary power granted under sec. 251.09, Stats., and the ordering of a new trial in the interest of justice. The writer would reverse and order a new trial in the interest of justice.

At the trial the doctor, an osteopath, appearing for the prosecution, was asked whether a tear to the introitus that he had found ". . . would that be consistent with a history given to you by the patient that she was raped?" Defense counsel objected on the grounds that (1) the question was not proper in form; (2) that it did not incorporate the records; and (3) that it did not meet the test of requiring an opinion to a reasonable degree of medical certainty. The majority opinion finds the question to have been "inadequately phrased." We would apply the cases cited in the majority opinion to find it improperly phrased. The trial court erred in overruling

the objection. It was properly objected to. Because of the significance of the doctor's testimony in the case, this error should entitle the defendant to a reversal and new trial in the interest of justice. No error is claimed or found in the trial court's permitting the medical witness to give an opinion in a field outside the area of his primary specialization and experience. However, such circumstance gives special reason to require the proper phrasing of an expert opinion question and the incorporation into it of the proper standard of certainty. This is particularly true where heavy reliance for qualifying the witness as an expert appears to have been placed on training received in medical school, rather than on experience as a treating or examining physician.[3]

Under the circumstances here present, we find special reason for holding that the defendant was entitled to have the expert opinion questions properly phrased.

Ordering a new trial in the interest of justice would remove a perhaps unavoidable but certainly unfortunate factor that may well have adversely affected the entire credibility of defendant's testimony. Here the defendant was charged and tried, not only with the crime of rape, but with illegal possession of marijuana. There is dispute as to where the marijuana came from, but it is not disputed that both the prosecutrix and defendant smoked or "took a drag" of the illegal cigarette. Only the defendant was criminally charged in connection with the marijuana aspect of this case. Midway in the trial, the defendant changed his plea on the marijuana charge from not guilty to guilty. Asked on oral argument whether this development might not have eroded the credibility of defendant's testimony (denying the forcible rape) with

_____

[3] From decision of trial court on motions after verdict: ". . . certainly every doctor who graduates from medical school is somewhat of an expert of many things which he hasn't actually seen or treated . . . or had extensive experience with . . . Accordingly, I believe generally speaking he is entitled to give an opinion on a broad background of medical experience, I mean medical training."

the jury, counsel for the state frankly conceded that it probably impelled the jury to disbelieve the defendant's denial of guilt on the rape charge. It is obvious that this may have happened. The basic issue in this entire case is one of credibility. As the trial court summarized the evidence, "There was definitely evidence of force in the testimony of the complaining witness and very definite evidence of no force in the testimony of the defendant." The jury had to decide who was to be believed. In retrospect, probably only in retrospect, it appears at least possible that the trial of defendant on both the rape and marijuana charges developed here to affect the fairness of the trial. Although both prosecutrix and defendant puffed the illegal cigarette, in the jury's mind, the marijuana smoke likely clouded or blurred only the defendant's account of what happened. Regardless of whether this alone would warrant directing a new trial, the possibility that the jury found the defendant guilty of rape in part because of his midtrial plea of guilty to the marijuana charge would be eliminated on a new trial.

I would reverse in the interest of justice and order a new trial.

